IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01254-KLM

SECURENET SOLUTIONS GROUP, LLC,

      Plaintiff,

v.

ARROW ELECTRONICS, INC.,

      Defendant.

_____

## ORDER
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendant's **Motion for Judgment on the Pleadings Regarding Patent Invalidity Pursuant to 35 U.S.C. § 101** [#39] (the "Motion").  Plaintiff filed a Response [#48] in opposition to the Motion [#39],[1] and Defendant filed a Reply [#53].  The Court has reviewed the briefs, the entire case file, and the applicable law, and is sufficiently advised in the premises.  For the reasons set forth below, the Motion [#39] is **DENIED**.[2]

---

[1]   The Court notes that both the Motion [#39] and the Response [#48] violate the undersigned's Civil Motions Practice Standards [#22], which were entered in this case on July 20, 2022, approximately eight months before the Motion [#39] was filed.  The page limitations for both motions and responses are 20 pages each.  *See* [#22] at 2.  Here, the Motion [#39] is 28 pages, and the Response [#48] is 43 pages (each exclusive of the certificate of service, attorney signature blocks, and table of contents).  The Court has chosen not to strike the briefs this time, but any future filings which violate these standards will be stricken without further warning.

[2]   This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent  of the parties.  *See* [#19, #20].

## I.  Summary of the Case[3]

"[T]he determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter . . . ."  *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014).  Accordingly, the Court goes into great detail regarding the patents underlying this lawsuit before addressing the issue of patent eligibility raised in the Motion [#39].[4]

This lawsuit was filed on May 19, 2022.  *Compl.* [#1].  In short, Plaintiff sues Defendant for patent infringement based on "the sale and offer for sale of various end-to-end [information technology (IT)] and [operational technology (OT)] solutions in the [internet-of-things] space."  *Id.* at 1.  Plaintiff asserts that Defendant offers and sells technologies for profit which are protected by and infringe on patents owned by Plaintiff, including U.S. Patent No. 9,344,616 (the "'616 patent"), "correlation engine for security, safety, and business productivity," issued May 17, 2016; U.S. Patent No. 10,862,744 (the "'744 patent"), "correlation system for correlating sensory events and legacy system events," issued December 8, 2020; and U.S. Patent No. 11,323,314 (the "'314 patent"),

---

[3]  For the purposes of resolving the Motion [#39], the Court accepts as true all well-pled, as opposed to conclusory, allegations made in Plaintiff's Complaint [#1].  *See Cowboys for Trump v. Oliver*, No. 21-2015, 2022 WL 454169, at *1 n.1 (10th Cir. Feb. 15, 2022) (citing *BV Jordanelle, LLC v. Old Republic Nat'l Title Ins. Co.*, 830 F.3d 1195, 1199 n.2 (10th Cir. 2016)) (discussing motions filed under Fed. R. Civ. P. 12(c)); *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022) ("When considering [patent] eligibility under a Rule 12 motion, [the Court] take[s] the facts alleged in the complaint as true.").

[4]  In the Complaint [#1], Plaintiff uses a number of technical and semi-technical terms without adequately defining those terms for the lay reader.  The Court has therefore provided definitions of many of these terms.  These definitions are *not* the law of the case, however, and carry *no* legal weight with respect to any future portion of this litigation, including claim construction.  The definitions merely demonstrate the Court's current understanding of the terms used by Plaintiff.

"hierarchical data storage and correlation system for correlating and storing sensory events in a security and safety system," issued May 3, 2022 (collectively, the "Asserted Patents"). *Id.*

In 2007 (the priority date for the Asserted Patents), smart surveillance systems gained commercial adoption and started to replace traditional security systems, causing challenges for large-scale data analysis. *Id.* ¶ 7. Plaintiff states that the claims of the Asserted Patents address a need arising specifically within the field of computerized security systems. *Id.* ¶ 6. Inventors Daniar Hussain and Dr. John Donovan conceived of the inventions after a three-day workshop with the IT Department for the Oakland County, Michigan confederation of police departments—the largest confederation of police departments in the country. *Id.* ¶ 7. During the workshop, police described several major problems with known police IT systems. *Id.*

The claims of the Asserted Patents disclose technical solutions to some of these challenges, such as reducing errors and false positives via a particular computerized process. *Id.* ¶ 8. In particular, the inventors conceived of systems and methods for using integrated cameras, sensor networks, and other data sources with a correlation engine that correlates two or more events weighted by the attribute data of the data sources.[5]

---

[5] "Attribute data" is a disputed term. *Opening Claim Construction Brief* [#44] at 33. Plaintiff states that this term "shall designate data about devices or sources (such as sensory devices), such as the quality of the data produced by the sensory device, the age of the sensory device, time since the sensory device was last maintained, integrity of the sensory device, reliability of the sensory device, and so on." *Id.*

*Id.*  Such correlations could effectively connect crime-related events to specific sensor data, other legacy system data,[6] 911 calls, anonymous tips, and video records.  *Id.*

Plaintiff provides a high-level depiction of one embodiment of the invention as illustrated in Figure 1 of its '744 Patent:



*Fig. 1*

*Id.* ¶ 9.  In this embodiment, various types of security-related data are collected from various sources, such as video cameras and other sensory devices, a video tip system, a card access system, a personnel system, and a vehicle information module.  *Id.*  These data describe "primitive events," which are atomic,[7] indivisible events from any subsystem, such as people entering a designated area, a vehicle driving the wrong way

---

[6] "Legacy system" is "a previous or outdated system."  *Opening Claim Construction Brief* [#44] at 8 (defining "legacy system" as an agreed term).

[7] "Atomic" is "extremely minute."  *See* dictionary.com/browse/atomic (definition #4).  Here, Plaintiff essentially appears to be stating that a primitive event is single, or individual, event.

in a designated lane, a package left behind in an area, a person screaming, glass breaking, or a gunshot.  *Id.*

The primitive events are then normalized by the normalization engine.[8]  *Id.* ¶ 10. The normalization engine normalizes the primitive events into a "normalized event 115," which is in a standardized format the system can recognize.  *Id.*  The specification[9] points out that each type of sensory device may have its own normalization engine, or, instead, one normalization engine, as shown in Figure 1 above, may have multiple modules[10] for each type of sensory device.  *Id.*

In the described embodiment, normalized events 115 are placed in event queue 116 for processing by correlation engine 117.  *Id.* ¶ 11.  The basic function of the correlation engine is to correlate two or more primitive events, combinations of primitive events and compound events, and combinations of compound events.  *Id.*  Carrying out this function is complex.  *Id.*  Figure 2 here shows how the correlation engine works in one embodiment of the invention:

---

[8]  "Normalization" is "the process of organizing data in a database."  *See* https://learn.microsoft.com/en-us/office/troubleshoot/access/database-normalization-description; *see also* csrc.nist.gov/glossary/term/normalize (defining "normalize" as "[t]he process by which differently formatted data is converted into a standardized format and labeled consistently"); csrc.nist.gov/glossary/term/normalization (defining "normalization" as "[c]onverting each log data field to a particular data representation and categorizing it consistently").

[9]  A "specification" is "[t]he part of a patent application describing how an invention is made and used, the best mode of operation of the claimed invention, and the inventor's claims."  Black's Law Dictionary (11th ed. 2019).

[10]  A "module" is a "part of a [computer] program that performs a distinct function."  *See* dictionary.com/browse/module (definition #6a).



*Id.*

As described by the specification, the correlation engine receives normalized events from the normalization engine. *Id.* ¶ 12. These normalized events are then filtered by a privacy filter 204, which applies a set of privacy rules defined by a system administrator. *Id.* For example, a privacy rule may instruct the system to ignore all primitive events between certain time periods, or to disregard other categories of data. *Id.*

After applying the privacy filter, the correlation engine applies the business filter, which applies a set of business rules set by a system administrator. *Id.* ¶ 13. The objective of the business filter is to eliminate unnecessary false alarms by disregarding events when they are not significant based on normal business processes. *Id.* For example, in a security system designed to guard a data center, a business filter could be configured to ignore primitive events taking place during hours when the data center is scheduled to be serviced. *Id.*

After the correlation engine has filtered primitive events based on the privacy and business rules, it evaluates the remaining primitive events for the presence of "compound events"—events that are composed of one or more primitive events. *Id.* ¶ 14.  An example of a compound event is tailgating, i.e., where two or more persons enter a designated area as detected on the video data using a person-counting algorithm, when only one corresponding swipe/access card is detected by the legacy access control system.  *Id.* Compound events may include primitive events from one sensor, from two or more sensors, or even from two disparate types of sensors.  *Id.*

Next, the correlation engine uses a "correlation module 210" to correlate both the primitive and compound events across geographical space.  *Id.* ¶ 15.  For example, the correlation engine may identify multiple tailgating events in different parts of a facility, or the loitering of two different vehicles in different parts of a campus.  *Id.*  The correlation module also correlates events across time, by comparing events detected presently with events detected in the past.  *Id.*  Examples include detection of the presence of the same individual allowing another to tailgate at different times, or the same person loitering or being stopped multiple times by security.  *Id.*

The correlation engine's forensic analysis of events is depicted in greater detail in Figure 10 of the specification:



*Id.* ¶ 16.  This figure depicts various sets of video data (i.e., $V_1$ through $V_i$; the large circles in the first column), with each subset corresponding to data obtained from a particular video camera.  *Id.*  The dashed circles inside $V_1$ through $V_i$ each represent a subset of video data.  *Id.*

This figure also depicts various sets of meta-data (i.e., $M_1$ through $M_i$; the large circles in the second column).  *Id.* ¶ 17.  Each set of meta-data is indexed and points to at least one set of video data.  *Id.*  As depicted in this figure, each set of meta-data corresponds to one and only one set of video data, but the relationship between meta-data and video data may be one-to-many, many-to-one, as well as many-to-many.  *Id.*

Finally, Figure 10 depicts various sets of attribute weight data (i.e., $W_1$ through $W_i$; the large circles in the third column).  *Id.* ¶ 18.  The sets of attribute weight data are sets of vectors which represent weights associated with subsets of the meta-data $M_1$.  *Id.*

8

These weights may be multi-dimensional.  *Id.*  For example, a two-dimensional weight may represent the attribute weights associated with (i) the reliability of a particular video camera for motion detection, and (ii) the reliability of that camera for gunshot detection. *Id.*  This would enable the system to account for the fact that a camera might have high motion detection reliability and low gunshot detection reliability, or vice-versa.  *Id.*  The specification provides an equation that can be used for determining weights for attribute data:

$$w_i = \sum_{k=1}^{N} \omega_k a_k$$

*Id.*  In this equation, the weights "$\omega_i$" may be a weighted average of attribute data ($a_i$).  *Id.* The symbol "$\omega_k$" refers to relative weights of the attributes ($a_k$), which are themselves weights associated with the data sources.  *Id.*

The specification further discusses how attribute weights may be recalculated to yield the weighted attribute data of (i) two or more events occurring substantially simultaneously, or (ii) any of two or more events occurring substantially simultaneously. *Id.* ¶ 19.  Respectively, the formulae are as follows:

(i)  *W(M₁∩M₂) = W(M₁) · W(M₂)*

(ii)  *W(M₁∪M₂) = W(M₁) + W(M₂) - W(M₁) · W(M₂)*

*Id.*

As the compound events and correlated events are detected, the correlation module stores them in the events database 118. *Id.* ¶ 20. The data may be stored in an events table such as the following Table 3:

TABLE 3

| | | | Events table | | | |
|---|---|---|---|---|---|---|
| MDEntryID | MDParameterID | MD_Event_DateTime | MD_Event_Duration | SrcID | Src_Description | Src_Location |
| . . . | . . . | . . . | . . . | . . . | . . . | . . . |
| 432 | 6 | Sep. 27, 2007 7:05:24PM | 1:05 | 1 | Camera 1 | Lobby |
| 433 | 16 | Sep. 27, 2007 7:10:18PM | 0:01 | 1 | Camera 1 | Lobby |
| 434 | 11 | Sep. 27, 2007 8:13:08PM | 0:01 | 9 | Card Reader in Server Room | Server Room |
| 435 | 10 | Sep. 27, 2007 8:13:10PM | 0:02 | 4 | Camera 34 | Server Room |
| 436 | 10 | Sep. 27, 2007 8:13:14PM | 0:02 | 4 | Camera 34 | Server Room |
| 437 | 12 | Sep. 27, 2007 8:13:24PM | 0:06 | 4 | Camera 34 | Server Room |
| 438 | 14 | Sep. 27, 2007 9:05:00PM | 0:26 | 23 | Registered Student | Off-campus (River St.) |
| 439 | 15 | Sep. 27, 2007 9:14:04PM | 0:10 | 2 | Camera 2 | Parking Lot |

*Id.* Here, the column "MDEntryID" contains the unique identifiers of the events. *Id.* "MDParameterID" refers to the types of events that were detected, which are fully described in a separate Meta-data parameters table. *Id.* An example of a Meta-data parameters table is as follows in Table 1:

TABLE 1

| | Meta-data parameters table | | | | |
|---|---|---|---|---|---|
| MDParametersID | Nickname | MDTypeID | SrcID | MD_TimeStart | MD_TimeEnd |
| 6 | Motion in Camera 1 | 1 | 1 | 17:00 | 8:00 |
| . . . | . . . | . . . | . . . | . . . | . . . |
| 10 | Person Enters Server Room | 23 | 4 | 0:00 | 23:59 |
| 11 | Swipe Card Detected to Server Room | 22 | 9 | 0:00 | 23:59 |
| 12 | Tailgating | 24 | 4 | 0:00 | 23:59 |
| 13 | Anonymous Video Tip | 98 | 22 | 0:00 | 23:59 |
| 14 | Registered Student Video Tip | 98 | 23 | 0:00 | 23:59 |
| 15 | Stolen Plate | 99 | 2 | 17:00 | 8:00 |
| 16 | Camera 1 loses connection | 105 | 1 | 0:00 | 23:59 |

*Id.* Here, the "MDParametersID" column contains the unique identifiers of the meta-data parameter, and "MDTypeID" refers to the Meta-data types, which are fully described in a separate Meta-data types table. *Id.* The "SrcID" column refers to the Sources table, which describes the devices (such as video cameras and card readers) used by the correlation engine. *Id.* The specification provides a number of examples to illustrate the functionality of the Meta-data parameters table and its relationship among the other tables. *Id.* One example is as follows:

> [T]he row "MDParametersID=6" corresponds to an event with a nickname "Motion in Camera 1." This event has "MDTypeID=1", which by examining Table 2 corresponds to a motion event. It has "SrcID=1", which by examining Table 4 corresponds to Camera 1 located in a lobby. Based on "MD_TimeStart" and "MD_TimeEnd", this event is only being monitored and recorded between the hours of 5:00 PM (17:00) and 8:00 AM (8:00) to protect privacy or to follow a business rule.

*Id.*

When the rule evaluation module 214 retrieves the events in the events database, it does so in accordance with a set of rules from a rules database 216. *Id.* ¶ 21. An exemplar Rules table from the rules database is depicted as follows in Table 5:

TABLE 5

| | | | Rules table | | |
|---|---|---|---|---|---|
| RuleID | Nickname | MDParamterID | ThresholdValue | ContactID | MsgTxt |
| 1 | Alert 1 | 6 | null | 4 | Motion in lobby during forbidden hours |
| 2 | Tailgating SR | 12 | null | 1 | Tailgating in server room |
| 3 | Global Alert | null | 61 | 7 | Null |
| 4 | Stolen Plate | 15 | null | 2 | Stolen plate detected in parking lot |
| 5 | Camera 1 goes down | 16 | null | null | Camera 1 has lost connection! |

*Id.* An exemplar description of an alert defined in Table 5 is provided by the specification:

> In the sample Rules table shown in Table 5, "AlertID"[11] is a primary key uniquely identifying each rule, "Nickname" provides a nickname for each rule, "MDParameterID" specifies which event (including primitive or compound events) . . . triggers the alert (or null if a system-wide alert), "ThresholdValue" specifies a threshold value which triggers an alert (for correlated system-wide alerts, or null if an event-based alert), "ContactID" specifies the group, or individual, that will receive the alert, or the set of actions that will be triggered by the alert, and "MsgTxt" specifies the text of the message sent on an alert. "ContactID" is a foreign key into another table (not shown) that specifies the list of recipients or the list of actions to be performed when the alert corresponding to "ContactID" is triggered.

*Id.*

The above description of the database tables is only a summary. *Id.* ¶ 22. The specification's "Database Design" section describes in great detail these and various other database tables, as well as the relationships among them. *Id.*

---

11   As far as the Court is able to determine, "AlertID" appears to be a scrivener's error which actually refers to the "RuleID" heading of the first column in Table 5. This apparent error appears to have been made in all three of the patents at issue here. *See, e.g.*, [#1-3] at 31-32 (the '616 Patent); [#1-4] at 35 (the '744 Patent); [#1-5] at 33 (the '314 Patent).

Based on the evaluation of rules by the rule evaluation module 214, the correlation engine issues alerts or performs other appropriate actions. *Id.* ¶ 23. These alerts may be issued in real-time in response to the correlation exceeding a particular threshold. *Id.* Sets of specific conditions may also be specified, and alerts and other actions can be configured to be triggered only when a certain set of conditions are met. *Id.*

Further, actions can be configured to be triggered based on accumulated value of multiple events across space and time. *Id.* ¶ 24. Although the specification provides that various equations may be used, it provides three examples of such equations:

$$a_1: \quad \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_1$$

$$a_2: \quad \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_2$$

$$\ldots$$

$$a_n: \quad \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_n$$

*Id.* In these equations, "a" indicates an action, "w" indicates attribute weights, "x" indicates non-video events, and "v" indicates video events. *Id.* These equations could represent a hierarchy of actions that would be activated for different threshold scenarios. *Id.*

The Asserted Patents also describe a Hierarchical Storage Manager ("HSM") for intelligent storage of large volumes of data created by security and surveillance applications, as shown in the illustration below. *Id.* ¶ 25.



*Id.* The HSM resolves a problem that arises from the sheer volume of sensor data in smart surveillance systems. *Id.* Routine operation of the sensors in the claimed invention generates large amounts of data. *Id.* For example, a typical 3-Mega-pixel digital surveillance camera generates images of approximately 280 kilobytes per second per frame. If the camera were running at 5 frames per second, it would generate approximately 60 gigabytes per day. In a typical application having 100 surveillance cameras around a particular facility, this translates to 6 terabytes per day or approximately 2,000 terabytes per year. *Id.* Ideally, requested data should be retrieved at the fastest rate, and this is possible only if all of the data is available on high-speed devices at all

times; this is beyond the ability of most organizations.  *Id.*  HSM enables data to be moved from a faster storage medium (like cache[12]) to a slower storage medium (such as tape).  *Id.*  One of the benefits of hierarchical storage is that performance is improved as unused data is moved to lower-level storage devices and frees up higher level (faster) storage devices, thus increasing overall system performance.  *Id.*  The Patent discloses particular ways of "cascading" storage.  *Id.*

One embodiment is illustrated by video data.  *Id.* ¶ 26.  A video data segment is stored by its importance ("Y"), which may be calculated as weighted attributes of the data (including attributes of the camera).  *Id.*  Such attributes include resolution of the data ("R"); reliability of the source (such as whether derived from a "video tip", "RS"); age of camera ("A"); location of camera ("L"); time since video was last accessed ("TS"); time of collection ("TM") and whether the data includes a "primitive event," along with attributes of the data.  *Id.*  As previously noted, a "primitive event" is an atomic, indivisible event from any subsystem, such as, for example, people entering a designated area, a package left behind in an area, a gunshot detected, a count of the number of cleaning people entering a building at a certain time, or locks on gates not engaged.  *Id.*

The importance of the video data segment may be calculated as a weighted average, as shown in the following equation, where $a_i$ is the attribute of the data and $w_i$ is the relative weight:

---

[12] In computer terminology, a "cache", also called "cache storage," is "a temporary storage space or memory that allows fast access to data."  *See* dictionary.com/browse/cache (definition #3).

$$Y = \sum_{i=1}^{i=N} w_i a_i$$

*Id.* ¶ 27.

For example, in a case of six attributes to a particular video data segment, each weighted equally, the importance is calculated as "Y=(L+R+A+RS+TM+TS)/6." *Id.* ¶ 28. Depending on the value of Y, the video data may be stored in the highest or other lower storage hierarchy. *Id.* When a given hierarchical level becomes nearly full, the video segments of lowest importance are automatically cascaded to free space to accommodate new data. *Id.* A HSM 401 manages the storage of the video data segments and their corresponding locations. *Id.* The stored events may be later queried and retrieved from the appropriate hierarchy and migrated to a faster location for processing. *Id.*

The HSM system is complex and implements the following functions and sub-systems or a sub-set thereof, as described in detail in the patent: (a) storage hierarchy including on-site and off-site (network or cloud based) storage of various speeds and cost; (b) HSM Migration: data migration policy between different levels codified by preset mathematical rules or operator override; (c) HSM Archiving: archival of data to slower or remote storage based on importance or frequency of use; (d) HSM Rules Engine: automated control or change of data storage location based on predefined policy rules being triggered; and (e) HSM Audit Trails: storage of an audit record including information about each data access event to enhance data privacy. *Id.* ¶ 29. In summary, the HSM

provides a detailed formal design and framework of operation to handle the large amounts of data produced by security and surveillance systems. *Id.*

In the present Motion [#39], Defendant moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), arguing that the asserted patents are invalid under 35 U.S.C. § 101, because (1) they are directed to the abstract idea of collecting data from sensors, storing the data in storage devices, analyzing the collected data, and providing an alert in response to the results of the data analysis, and (2) there is no "inventive concept" underlying the asserted claims to make them patent-eligible. *Motion* [#39] at 1, 20.

## II.  Standard of Review

Fed. R. Civ. P. 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  "Judgment on the pleadings should not be granted 'unless the moving party clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"  *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006) (citation omitted).  A motion for judgment on the pleadings made pursuant to Rule 12(c) is reviewed under the same legal standard as a motion for failure to state a claim made pursuant to Fed. R. Civ. P. 12(b)(6).  *Mock v. T.G. & Y Stores Co.*, 971 F.2d 522, 528 (10th Cir. 1992).

The Rule 12(b)(6) standard tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted").  "The court's

function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted). To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007). That is, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1235 (10th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do, [n]or does the complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (internal quotation marks omitted).

### III.  Analysis

### A.    Legal Framework

Patent invalidity is an affirmative defense to an infringement claim. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 644 (2015). The Patent Act defines what subject matter is eligible for patent protection: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "Following examination by the Patent and

Trademark Office, a duly issued patent is presumed valid . . . ." *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (10th Cir. 1985). "This statutory presumption derives in part from recognition of the technological expertise of the patent examiners." *Id.* Despite this presumption, the Court is obligated "to reach an independent conclusion" as to the validity of the patent. *Id.* The burden of proving that a patent is invalid "resides with the person challenging its validity." *Id.* (citing 35 U.S.C. § 282).

"Patent eligibility under 35 U.S.C. § 101 is a question of law that may contain underlying issues of fact." *CardioNet, LLC v. Infobionic, Inc.*, 955 F.3d 1358, 1367 (Fed. Cir. 2020). "Accordingly, the § 101 inquiry is properly raised at the pleading stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter." *TakaDu Ltd. v. Innovyze, Inc.*, No. CV 21-291-RGA, 2022 WL 684409, at *3 (D. Del. Mar. 8, 2022) (citing *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 2621 (2018)). "The inquiry is appropriate at this stage "'only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'" *TakaDu Ltd.*, 2022 WL 684409, at *3 (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)). "In addressing this question, the Court may only look to allegations in 'the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.'" *Interactive Wearables, LLC v. Polar Electro Oy*, 501 F. Supp. 3d 162, 170 (E.D.N.Y. 2020) (quoting *Aatrix*, 882 F.3d at 1128).

Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v.*

*Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (internal quotation marks and brackets omitted).  "Accordingly, in applying the § 101 exception, we must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention."  *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (internal citations, quotation marks, and alterations omitted).

The Court's analysis to determine what is and what is not patentable proceeds in two steps.  *Id.*  "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts."  *Id.*  If the answer is No, then the claims are patent eligible under § 101, and the Court need not reach step two.  *CardioNet, LLC*, 955 F.3d at 1371; *TakaDu Ltd.*, 2022 WL 684409, at *6.  However, if the answer at step one is Yes, then the Court proceeds to the second step, which asks: "What else is there in the claims before us?"  *Id.*

> To answer that question, we consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application.  We have described step two of this analysis as a search for an "inventive concept"—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.

*Id.* at 217-18 (internal citations, brackets, and quotation marks omitted).

**B.    Application of *Alice***

For Defendant to succeed on its Motion [#39], it must first show that the asserted patents are directed to a patent ineligible abstract idea under *Alice* step one.  *Alice*, 573 U.S. at 217.  Then, Defendant must show that the abstract idea does not contain an inventive concept adequate to transform the abstract idea into patentable subject matter

under *Alice* step two.  *Id.*  Here, the Court assumes for purposes of adjudicating the present Motion [#39] that Defendant has successfully met the first step.  However, even assuming such, the Court finds that the Motion [#39] must be denied under *Alice* step two, for the reasons explained below.

Throughout its briefing, Defendant relies heavily on *SecureNet Solutions Group, LLC v. Senstar Corp.*, No. 19-cv-02913-NRN, 2020 WL 2557625 (D. Colo. May 20, 2020).  *Motion* [#39] at 1.  On October 14, 2019, Plaintiff here filed suit against Senstar Corporation, alleging infringement of U.S. Patent Nos. 7,737,837, 8,013,738, 8,130,098, 8,354,926, and 8,730,040 (collectively, the "Related Patents").  The latter four of the Related Patents are all within the same patent family as the Asserted Patents in the present case.  *Motion* [#39] at 2 n.3.  Although Plaintiff does not agree with the entirety of the *Senstar* court's holdings, Plaintiff does not contest the relationship between the Related Patents in *Senstar* and the Asserted Patents in this case.  *Response* [#48] at 34.

Senstar filed a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), based on the purported invalidity of the Related Patents under 35 U.S.C. § 101.  *Motion* [#39] at 2.  In short, Senstar argued that, while the Related Patents are related to security and surveillance systems, they are actually directed to the abstract idea of collecting data from sensors, analyzing the data, and taking action in response to the result of the data analysis—actions that soldiers, police officers, sentries, and other types of security guards have been performing "since time immemorial."  *Senstar*, 2020 WL 2557625, at *14.  In response, Plaintiff argued that its inventions improve existing computerized surveillance systems by correlating events and weighing the associated data; that the Related Patents constitute improvements in the field of computerized

surveillance systems by implementing the Hierarchical Storage Manager; and that the use of attribute data of sensors to reduce error rate is a concrete solution to a real-world problem in assigning reliability to sensors that are unequal in data quality based on a multitude of technical factors.  *Id.*  These arguments are essentially identical to those made in the present lawsuit.

Ultimately, the *Senstar* court found at *Alice* step one that the Related Patents (from which the Asserted Patents in *this* case claim priority) are directed to an abstract idea.[13] *Id.* at 1.  At *Alice* step two, the *Senstar* court determined that the motion could not be granted given the sources the court may consider on a motion to dismiss and because doing otherwise would require a factual determination regarding whether there was an inventive concept present that could transform the claims into ones that were patent-eligible.  *Senstar*, 2020 WL 2557625, at *12; *see Aatrix Software, Inc.*, 882 F.3d at 1128 (stating that, under *Alice* step two, "[w]hether the claim elements or the claimed combination are well-understood, routine, [or] conventional is a question of fact").

In the present Motion [#39], Defendant argues that the *Alice* step two factual issues identified by the *Senstar* court, which caused the motion to dismiss based on patent ineligibility to be denied, are here resolved by the expert declarations attached to Plaintiff's Complaint [#1], based on certain "key concessions" they purportedly make. *Motion* [#39] at 21.  Defendant states, "[s]pecifically, the declarations confirm that the four

---

[13]     In its Reply [#53], Defendant states that, "[w]hile Arrow believes SecureNet is collaterally estopped from relitigating Judge Neureiter's *Alice* step-one holding from *Senstar* in the present case, it is unnecessary for the Court to address the issue given the clarity on the merits, as detailed by Judge Neureiter."  *Reply* [#53] at 3 n.2.  Given this statement, and given that the Court decides the Motion [#39] on Alice step-two grounds, the Court need not address the issue of collateral estoppel.

allegedly inventive concepts [Plaintiff] identified in the *Senstar* case are nothing more than well-understood, routine, conventional activity: (1) attribute data representing information about the sensor used to capture the sensory data; (2) weighting of the attribute data; (3) correlation of primitive events which are weighted by attributed data; and (4) the hierarchy of two or more data storage devices." *Id.* Defendant's *Alice* step-two argument cites only the expert declarations attached to the Complaint [#1] and does not cite the allegations of the Complaint [#1] itself. *See id.* at 21-27.

Although Defendant first argues in the Motion [#39] that the expert declarations attached to Plaintiff's Complaint [#1] *should* be considered under *Alice* step two to resolve the factual issues identified in *Senstar*, Defendant changes course in its Reply [#53] by arguing that the declarations should *not* be considered. Specifically, in the Reply [#53], Defendant acknowledges that Plaintiff "goes beyond the pleadings and relies exclusively on the improper declarations to argue that three claim elements—the hierarchical storage manager, attribute data, and historical correlation over time and space—are inventive." *Reply* [#53] at 4. Perhaps this is why Defendant retracts its initial argument regarding the declarations, instead arguing in the Reply that Plaintiff's eligibility-focused expert declarations submitted with its Response [#48] meet none of the relevant criteria for consideration on a Rule 12 motion to dismiss. *Id.* at 1-2. Defendant asserts that "the declarations contain factual allegations contradictory to the damning concessions cited in [Defendant's] Motion, are conclusory, and are improperly directed to questions of law for the Court." *Id.* at 2. Thus, Defendant argues, "these portions of the declarations and all references to them should be disregarded in the Court's evaluation" of Defendant's

Motion [#39].  *Id.*  Defendant concludes that, "[o]nce those declarations properly are disregarded, [Plaintiff] has no argument on *Alice* step-two."  *Id.* at 4.

Defendant asks the Court to disregard "portions" of the declarations, which the Court infers means the portions that are not favorable to Defendant's argument.  *Id.* at 2.  However, even if the Court were inclined to disregard parts of the declarations, Defendant has not specified which exact parts should be disregarded and which exact parts should be considered.

Regardless, the Court finds that the declarations should be disregarded in full, for purposes of adjudicating the present Motion [#39].  In *Marble Voip Partners LLC v. Zoom Video Communications, Inc.*, No. 22-CV-2247-JAR-ADM, 2023 WL 3055323, at *3-4 (D. Kan. Apr. 24, 2013), the court decided whether to consider an expert declaration attached to a complaint when adjudicating a Rule 12(b)(6) motion to dismiss based on purported § 101 patent ineligibility, the precise issue faced by the Court here.  The *Marble* court decided that it should not consider the declarations for two reasons.  First:

> While the analysis in this case requires consideration of some highly technical concepts, the Federal Circuit has recognized that patent eligibility can be determined at the Rule 12(b)(6) stage without the aid of expert testimony.  The Federal Circuit has made clear that it is the patent itself that defines the metes and bounds of intellectual property.  Thus, the fact that Marble is defending against a § 101 invalidity challenge does not necessarily mean that it is authorized to introduce expert declarations at the Rule 12(b)(6) stage.

*Marble*, 2023 WL 3044323, at *3 (internal footnotes, citations, and quotation marks omitted).  Second:

> Nor does the [Expert] Declaration qualify as the sort of material a court would be permitted to consider when ruling on a Rule 12(b)(6) motion to dismiss.  While the Tenth Circuit has not specifically addressed this issue, other Circuit Courts of Appeal and district courts in this Circuit have held

that an expert declaration is not a "written instrument" within the meaning of Rule 10(c).  The Court finds these holdings to be persuasive and thus exercises its discretion to disregard the [Expert] Declaration attached to the [First Amended Complaint] because it is not a "written instrument" under Fed. R. Civ. P. 10(c).

*Id.* at *4 (internal footnote and citation omitted).  For the same reasons cited by the *Marble* court, the Court here finds that the expert declarations attached to Plaintiff's Complaint [#1] should be disregarded for purposes of resolving the Motion [#39].

Because the Court does not consider the expert declarations, Defendant's *Alice* step-two argument fails, given that Defendant relies solely on the declarations submitted by Plaintiff.[14]   Defendant also does not argue that, absent consideration of the declarations, there are no factual issues in the present case so as to allow for entry of judgment on the pleadings.

In addition, Defendant does not argue that the *Senstar* court was incorrect in holding that factual issues barred dismissal of the case at this step.  After outlining the parties' arguments, the *Senstar* court concluded its *Alice* step-two analysis as follows:

Taking guidance from the *Berkheimer* decision, I decline to dismiss SecureNet's Complaint under Rule 12(b)(6).  At this stage of the proceedings, I must read the Complaint liberally and draw all reasonable inferences in the light most favorable to the non-movant.  Whether the cited limitations of the hierarchy of storage devices, the weighing of attribute data, and the correlating of that data provide the requisite inventive concepts necessary to make Plaintiff's claims patent-eligible under § 101, depends on whether they involve more than performance of well-understood, routine,

---

[14]   The Court is aware that Plaintiff has included much of the language from the Declarations in the Complaint [#1] itself.  However, the Court is not inclined to sua sponte extend Defendant's argument, which cites only the Declarations, to the language of the Complaint [#1] itself.  Doing so would require the Court to examine the cited portions of the Declarations, then independently search the Complaint [#1] to see whether the cited statements are also found there, and then determine if and how Defendant's argument applies to whichever statements are found in the Complaint [#1].  Doing so would cause the Court to stray too far from its role as a neutral adjudicator and into the realm of advocacy, particularly here where both sides are represented by experienced counsel.

and conventional activities previously known to the industry.  The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact.  Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence.

So, while the issue of patent eligibility is ultimately a question of law, based on the allegations here, as well as the contents of the Patents-at-issue, I cannot conclude at this early stage that there is no inventive concept present that could transform the claims such that they might be patent-eligible.  Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art.  The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.  It goes without saying that the Court was not a skilled artisan at the time of the patent.  Therefore, while on the surface it might appear to be a close question, and an uninformed instinctual reaction might suggest that Senstar has the better side of the argument, I am unable at this point to make the necessary factual determination without additional information.  In this case, just as in *Aatrix Software*, the question cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.

*Senstar*, 2020 WL 2557625, at *12 (internal citations, brackets, and quotation marks omitted).  Having thoroughly considered the *Senstar* court's analysis, and in the absence of any argument by Defendant distinguishing *Senstar* from the present case (given that the expert declarations may not be considered), the Court finds here as well that factual issues bar a finding of patent ineligibility at this stage of the case.  As Plaintiff states, "[t]he Claims include the same limitations of weighting, hierarchical storage, and correlation of historical data across time and space" as found by the *Senstar* court, and therefore "[t]his Court should not resolve factual disputes on a motion for judgment on the pleadings." *Response* [#48] at 40 n.155.

Accordingly, the Motion [#39] is **denied**.

## IV.  Conclusion

For the foregoing reasons,

IT IS HEREBY **ORDERED** that the Motion [#39] is **DENIED**.


Dated: June 5, 2023

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge