IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01254-KAS

SECURENET SOLUTIONS GROUP, LLC,

     Plaintiff,

v.

ARROW ELECTRONICS, INC.,

     Defendant.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

     This matter is before the Court on the parties' **Joint Motion for Determination** [#63] (the "Motion"), indicating that claim construction briefing is complete and asking the Court for a hearing and determination of the construction of the disputed claim terms identified by the parties' briefing. On November 17, 2023, the Court held a claim construction hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). *See Am. Minute Entry* [#83]. The Court has reviewed Defendant's Opening Claim Construction Brief [#44] (the "Brief"), Plaintiff's Response [#56], Defendant's Reply [#62], the Transcript [#88] from the November 17, 2023 hearing, the PowerPoint presentations provided by the parties at that hearing, the entire case file, and the applicable law. For the reasons set forth below, the Motion [#63] is **GRANTED** and the claim terms will be construed as indicated below.[1]

_____

[1] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#19, #20]; *Reassigning Magistrate Judge* [#72].

## I. Summary of the Case

In short, Plaintiff sues Defendant for patent infringement based on "the sale and offer for sale of various end-to-end [information technology (IT)] and [operational technology (OT)] solutions in the [internet-of-things] space." *Compl.* [#1] at 1. Plaintiff asserts that Defendant offers and sells technologies for profit which are protected by and infringe on two patents owned by Plaintiff: (1) U.S. Patent No. 10,862,744 (the "'744 Patent"), consisting of a "correlation system for correlating sensory events and legacy system events," issued December 8, 2020; and (2) U.S. Patent No. 11,323,314 (the "'314 Patent"), consisting of a "hierarchical data storage and correlation system for correlating and storing sensory events in a security and safety system," issued May 3, 2022 (collectively, the "Asserted Patents"). *Id.* ¶¶ 79, 106. Plaintiff had originally sued regarding a third patent as well, U.S. Patent No. 9,344,616 (the "'616 Patent"), consisting of a "correlation engine for security, safety, and business productivity," issued May 17, 2016. *Id.* ¶ 50. However, pursuant to the terms of a settlement agreement, the claim underlying that patent has been dismissed. *See Am. Minutes* [#83].

In the present Motion [#63], the parties ask the Court to construe seventeen terms found in the three patents. As discussed in more detail below, twelve of these terms are no longer at issue because either they applied solely to the now-dismissed '616 patent claim or else the parties came to agreement as to how the terms should be construed.

## II. Legal Standard

"Claim construction is a question of law for the court[.]" *Warming Trends, LLC v. Ray Stone*, No. 19-cv-03027-PAB-STV, 2022 WL 17177472, at *2 (D. Colo. Nov. 23, 2022) (citing *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015)). The

Court's determination is "guided by Federal Circuit precedent." *Id.* (citing *SunTiger, Inc. v. Sci. Rsch. Funding Grp.*, 189 F.3d 1327, 1333 (Fed. Cir. 1999)). "'[T]here is no magic formula or catechism for conducting claim construction.'" *Id.* (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc)). "Nevertheless, there are several key sources and doctrines that should be consulted and applied, but '[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law.'" *Id.* (quoting *Phillips*, 415 F.3d at 1324).

Courts start with the "bedrock principle" that "the claims of a patent define the invention to which the patentee is entitled" to exclusive rights. *Id.* (quoting *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004))). "Generally speaking, [courts] indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). "Ordinary and customary meaning" is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Phillips*, 415 F.3d at 1313. If the claim language "involves little more than the application of the widely accepted meaning of commonly understood words," then "the ordinary meaning . . . as understood by a person of skill in the art may be readily apparent even to lay judges[.]" *Id.* at 1314. However, if the claim language has a particular meaning in the field, the Court must "look[ ] to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova*, 381 F.3d at 1116). "Those sources include the words of the claims themselves, the remainder of the specification,

the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova*, 381 F.3d at 1116.

"The context in which a term is used, both in the asserted claim as well as in other claims of the patent, can be valuable and instructive." *Warming Trends, LLC*, 2022 WL 17177472, at *2 (citing *Phillips*, 415 F.3d at 1314). Further, the patent specification, which consists of the text and figures that precede the claims, "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id*. (quoting *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996))). Importantly, though, "the claim requirement presupposes that a patent applicant defines his invention in the claims, not in the specification." *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002). In other words, "the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly[.]" *PSC Comp. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1359 (Fed. Cir. 2004) (quoting *United States v. Adams*, 383 U.S. 39, 48-49 (1966)).

"If necessary, courts may also consider the patent's prosecution history – the official record of the patent application and subsequent process before the U.S. Patent and Trademark Office, which 'provides evidence of how the PTO and the inventor understood the patent.'" *Warming Trends, LLC*, 2022 WL 17177472, at *3 (quoting *Phillips*, 415 F.3d at 1317). However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, . . . it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

4

### III.  Analysis

**A.     Extrinsic Evidence**

In its Reply [#62], Defendant argues that Plaintiff's Response [#56] improperly relies on previously-undisclosed extrinsic evidence and expert opinion. *See* [#62] at 1, 1 n.1, 1 n.2; *see also, e.g.*, *Tr.* [#88] 27:22-28:1.[2]

"[A]lthough courts may consult extrinsic evidence such as 'expert and inventor testimony, dictionaries, and learned treatises,' such evidence is 'less significant than the intrinsic record,' i.e., the specification and prosecution history, and courts must be wary not to use extrinsic evidence to override the meaning of the claim terms demonstrated by the intrinsic evidence." *Warming Trends, LLC*, 2022 WL 17177472, at *3 (quoting *Phillips*, 415 F.3d at 1317-19 (citation omitted)). In other words, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.

Defendant makes two separate arguments in support of its assertion that Plaintiff's evidence should be stricken. First, Defendant asserts that Plaintiff violates D.C.COLO.LPtR 14 by citing previously-undisclosed evidence and an expert declaration in support of its proposed constructions of disputed terms. *Reply* [#62] at 1 n.1. Defendant specifically points to the following aspects of Plaintiff's evidence (and references thereto) which Defendant argues should be stricken: (1) Exhibit 4 [#56-5] (and corresponding reference in Response [#56] at 5 n.7.): Lisa Brown et al., *IBM Smart Surveillance System (S3): An open and extensible architecture for smart video surveillance, IBM T.J. Watson*

---

[2] For all briefs and exhibits other than transcripts and the patents, the Court cites the page numbers of the Court's electronic docket system rather than to any internal page numbering made by the parties on the documents.

5

*Research Center, Proceedings of the IEEE Conference on Advanced Video and Signal Based Surveillance*, AVSS 2005, Sept. 15-16, 2005 (the "IBM Paper");  (2) Exhibit 5 [#56-6] (and corresponding reference in Response [#56] at 8 n.20): McGraw Hill Computer Desktop Encyclopedia, copyrighted 2001, defining "module"; and (3) Declaration of Mukul Shirvaikar [#56-1].[3,4] *Id.*

D.C.COLO.LPtR 14 provides in full: "By the date specified in the Patent Scheduling Order, the parties shall file a Joint Disputed Claim Terms Chart identifying the disputed claim terms and phrases and each party's proposed construction with citations to supporting intrinsic and extrinsic evidence." The Court finds that Defendant's reading of this rule is too restrictive. The rule does not specify that *all* supporting evidence must be provided in connection with the parties' Joint Disputed Claim Terms Chart. In fact, in *Smith Sport Optics, Inc. v. Burton Corporation*, No. 21-cv-02112-CMA-SKC, 2023 WL 6794321,

---

[3] Defendant also points to Plaintiff's Exhibit 1 [#56-2], which is a copy of the '616 Patent with certain portions highlighted by Plaintiff. Defendant's brief renders unclear why Defendant believes this to be extrinsic evidence, and particularly given that Defendant does not point to Plaintiff's Exhibit 2 [#56-3] or Exhibit 3 [#56-4], which are highlighted copies of the '744 Patent and '314 Patent, respectively. Regardless, given that the '616 Patent is no longer at issue in this case and that the Court does not substantively refer to it, Defendant's argument as to Exhibit 1 [#56-2] is moot. The Court notes, though, that Plaintiff's reference to Exhibit 1 may have been a drafting error, as the Declaration of Mukul Shirvaikar [#56-1] is listed as the first attachment to Plaintiff's Brief [#56], even though it is not labeled as Exhibit 1. The Court addresses the Declaration below in this section.

[4] In addition, Defendant points to Plaintiff's Exhibit 6 [#56-7] (and corresponding reference in Response [#56] at 44 n.101): Rob, P. and Coronel C., "Thomson Course Technology, Database Systems: Design, Implementation, and Management" 7th Edition, 704 pp. (2007). *Reply* [#62] at 1 n.1. Plaintiff cites this exhibit solely in connection with its argument concerning the terms "normalizing the primitive sensory events into a standardized format" and "normalized sensory events." *Response* [#56] at 44 n.101. However, as discussed below in Section III.C., these terms were only at issue in connection with the '616 Patent, which itself is no longer at issue, and therefore the Court need not construe these claims and need not consider Plaintiff's citation to Exhibit 6. Thus, Defendant's argument that the Court should decline to consider this exhibit on other grounds is moot.

at *2 (D. Colo. Oct. 13, 2023), the court explicitly noted that, while many district courts require a party to do so, particularly in relation to expert testimony, the District of Colorado "does not specify such a requirement." Accordingly, the Court finds that Plaintiff's evidence should not be stricken for violation of D.C.COLO.LPtR 14.

Second, Plaintiff argues that Defendant's reliance on the Declaration [#56-1] provided by Mukul Shirvaikar ("Shirvaikar") is inappropriate in this case, because "expert testimony concerning what one of ordinary skill in the art would understand reading the specification [can] not create structure where none was disclosed in the specification." *Reply* [#62] at 1 n.2 (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1354 (Fed. Cir. 2015)). This argument goes to the sufficiency of the evidence rather than to whether the Court can consider Dr. Shirvaikar's Declaration [#56-1] at all. Although the Court takes Defendant's argument into consideration when referencing this Declaration in its analysis below, the Court does not find that the Declaration should be stricken as inappropriate extrinsic evidence.

**B.    Person of Ordinary Skill in the Art**

"[A] court must construe the claim terms as they would be viewed by 'the ordinary artisan after reading the entire patent' . . . in order to respect the public notice function of patents[.]" *Warming Trends, LLC*, 2022 WL 17177472, at *3 (quoting *Phillips*, 415 F.3d at 1321). In other words, "[p]atent claims are to be construed through the eyes of a person of ordinary skill in the art in question at the time of the invention[.]" *Energy Env't Corp. v. City and County of Denver*, No. 21-cv-02235-PAB-SBP, 2024 WL 1300266, at *5 (D. Colo. Mar. 26, 2024). This "person of ordinary skill in the art" is often referred to as a

"POSITA" or a "PHOSITA." *See, e.g.*, *id.*; *Broadnet Teleservices, LLC v. Shoutpoint, Inc.*, No. 12-cv-02921-CMA-KMT, 2015 WL 13614122, at *2 (D. Colo. July 15, 2015).

Here, Defendant "submits that a hypothetical POSITA as of the date of the alleged inventions would be a person with at least two or three years of experience working in the security/surveillance industry, more specifically, having substantial direct experience in intelligent surveillance systems. In addition, a hypothetical POSITA could have an undergraduate degree in computer engineering or equivalent experience working in the field." *Brief* [#44] at 15. Defendant does not reference any specific evidence in support of this assertion.

Plaintiff asserts that "[t]he skilled artisan here had an electrical engineering or computer science undergraduate degree or at least two years of experience in implementing or setting up the systems of the Asserted Claims and with an understanding of processing data from sensors." *Response* [#56] at 7. In support, Plaintiff cites the Declaration of Dr. Shirvaikar. *See* [#56-1] ¶ 8.

At the Claims Construction Hearing, the parties did not present argument about whose POSITA definition is correct, although Plaintiff's counsel conceded that the two definitions were "substantially similar." *Tr.* [#88] at 75:12-19. The Court agrees with this assessment, particularly as neither party argued that there were significant differences. However, particularly given the evidentiary support underlying Plaintiff's phrasing, the Court finds its definition most helpful and therefore adopts it. *See, e.g.*, *Energy Env't Corp.*, 2024 WL 1300266, at *6 (determining which POSITA definition was most helpful and adopting that party's version).

**C.    Mooted Terms**

The following terms applied only to the '616 patent, and therefore any request to construe them is now moot: (1) "safety procedures," as found in the '616 patent, claim 41, *see Brief* [#44] at 25; (2) "primitive sensory events, as found in the '616 patent, claims 39 and 49, *see id.*; (3) "normalizing the primitive sensory events into a standardized data format," as found in the '616 patent, claim 39, *see id.* at 28; (4) "normalized sensory events," as found in the '616 patent, claim 39, *see id.* at 29; (5) "attribute data comprises a quality of sensory data produced by the one or more sensors," as found in the '616 patent, claim 49, *see id.* at 34; and (6) "primitive sensory events are weighted based on at least on one or more attribute data of the one or more sensors," as found in the '616 patent, claim 49, *see id.* at 34.

## D.    **Agreed Terms**

Prior to the hearing, the parties agreed on the meaning of three terms:

First, the parties agreed that the term "legacy system" in Claim 1 of the '744 Patent means "a previous or outdated system."  *Brief* [#44] at 15.

Second, the parties further agreed that the term "speed of an object" in Claim 1 of the '314 Patent means "rate of motion or velocity of an object." *Brief* [#44] at 30; *Response* [#56] at 7; *Reply* [#62] at 7 n.7.

Third, the parties also agreed that the term "sensor" in all asserted claims means "a device that detects or measures a physical property and/or chemical property and records, indicates, or otherwise responds to it." *Brief* [#44] at 32; *Response* [#56] at 7; *Reply* [#62] at 7 n.7.

During the hearing, the parties agreed on three more terms:

First, the parties agreed that the terms "automatically analyzing said primitive sensory events, across at least one of time and space, for one or more historical correlations among the historical normalized sensory events" and "automatically analyzing the stored sensory events and the stored legacy events across at least one of time and space, for one or more historical correlations among the stored sensory events and the stored legacy events," as found in Claim 1 of the '744 Patent, *see Brief* [#44] at 27-28, mean "automatically analyzing primitive sensory events for a historical correlation based on rules." *Tr.* [#88] at 164:4-165:20.

Second, the parties agreed that the term "inventory system," as found in Claim 1 of the '744 Patent, *see Brief* [#44] at 31, means "a system that monitors an itemized list of current goods on hand." *See id.*; *Tr.* [#88] at 167:25-168:1.

Third, the parties agreed that the term "attribute data," as found in Claim 13 of the '314 Patent, *see Brief* [#44] at 33, means that "'attribute data' shall designate data about devices or sources (such as sensory devices), such as the quality of the data produced by the sensory device, the age of the sensory device, time since the sensory device was last maintained, integrity of the sensory device, or reliability of the sensory device."[5] *Tr.* [#88] at 169:19-25.

---

[5] There appears to have been some confusion at the hearing over whether the last clause of this construction ended with "integrity of the sensory device." *See Tr.* [#88] at 169:23-170:21. However, given that the "reliability" clause appears identically in both parties' proposed constructions, and given that the parties did not mention at the hearing that they wanted to omit this clause, and given the overall discussion at the hearing and in the briefs, the Court finds that the parties intended to keep the "reliability" clause in their agreed-upon construction. To the extent this may not be correct, they may confer and file a notice clarifying their agreement as to this term.

E.      **Disputed Terms**

The parties divide the remaining disputed terms into two categories: (1) means-plus-function terms, and (2) other terms, of which only one remains to be construed. The Court begins with this latter category.

"A term is indefinite if it 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Warming Trends, LLC*, 2022 WL 17177472, at *5 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)). "To prove that a term is indefinite, a party must 'demonstrate by clear and convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art.'" *Id.* (quoting *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010)).

Thus, here Defendant has the burden of proof regarding indefiniteness by clear and convincing evidence. *See E-Numerate Sols., Inc. v. United States*, 170 Fed. Cl. 147, 154 (Fed. Ct. Cl. 2024). "'Clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" *Miller v. Dep't of Justice*, 842 F.3d 1252, 1257-58 (Fed. Cir. 2016) (citation omitted). "The clear and convincing burden of proof imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted).

## 1.   "Critical Events"

The claim term "critical events" is found in the '314 Patent, Claim 1, and the '744 Patent, Claim 1. *Brief* [#44] at 24. Relevant phrases from the '744 Patent, Claim 1, include: "to monitor continuously and in real-time the sensory events and the legacy events to identify one or more critical events" and "to send one or more alerts based on the one or more critical events." *See also* '314 pat., cl. 1 (employing materially similar language on the first phrase and identical language on the second phrase). Plaintiff states that "[a] review of 'critical event' in the context of the claims is that it is a class of events that causes the issuance of an alert and furthermore, it is identified, per the claim language, based on a correlation that is calculated or evaluated via real-time monitoring and based on historical correlation of sensory events." *Response* [#56] at 38-39. Thus, Plaintiff's proposed construction of this term is "events that generate an alarm or trigger an action." *Brief* [#44] at 24.

Defendant asserts that "Claims 1 and 13 of the '314 Patent . . . and Claim 1 of the '744 Patent are invalid as indefinite."[6] *Id.* In short, Defendant states that this term is indefinite because it is "entirely subjective and depend[s] on the whim of the user of the system based on categories of data collected from sensors." *Reply* [#62] at 7 (citing *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1348 (Fed. Cir. 2022) (stating that "terms of degree render a claim indefinite where the intrinsic evidence . . . provides insufficient guidance as to any objective boundaries for the claims—including where the claims are 'purely subjective' such that their scope cannot be determined with reasonable

---

[6] The Court notes that Claim 13 of the '314 Patent does not explicitly mention "critical events," although it does refer to Claim 1, where the term "critical events" is found.

certainty"). Defendant argues that the term "does not inform those of skill in the art about the scope of the invention with reasonable certainty because it does not explain what makes an event 'critical.'" *Brief* [#44] at 44 (citing *Nautilus, Inc.*, 572 U.S. at 910). Defendant states that "[t]he Asserted Patents' specifications provide little guidance regarding what makes an event 'critical,' and in fact, introduce more confusion with their disparate descriptions of 'critical event.'" *Id.* (citing '314 pat. at Abstract ("The events are then monitored for an occurrence of one or more correlations of interest, or one or more critical events of interest."), col. 2:45-47 (stating that "the one or more critical events are based at least on the one or more historical correlations"), col. 3:18-21 ("In one embodiment, the one or more critical events are determined from one or more safety procedures, and wherein the one or more alerts are sent when one or more of the safety procedures are violated.").

In response, Plaintiff points to the bedrock claim construction principle that "a term is viewed through the lens of a skilled artisan," i.e., a POSITA. *Response* [#56] at 39; *see WSOU Invs. LLC v. Google LLC*, Nos. 2022-1066, 2022-1067, 2023 WL 6210607, at *7 (Fed. Cir. Sept. 25, 2023) ("Generally, the terms of a claim are properly construed when they are given their ordinary and customary meaning, which is the meaning that the terms would have to a skilled artisan at the time of invention.") (citing *Phillips*, 415 F.3d at 1312-13). Plaintiff emphasizes that Table 5, where alerts are signified, is user-generated. *Response* [#56] at 39; *see also Tr.* [#88] 124:6-124:15, 126:4-5 (explaining that Table 5 provides an "objective way to determine a critical event"). Table 5 is an example rules table, as seen at 216 in Figure 2:

### TABLE 5

Rules table

| RuleID | Nickname | MDParamterID | ThresholdValue | ContactID | MsgTxt |
|---|---|---|---|---|---|
| 1 | Alert 1 | 6 | null | 4 | Motion in lobby during forbidden hours |
| 2 | Tailgating SR | 12 | null | 1 | Tailgating in server room |
| 3 | Global Alert | null | 61 | 7 | Null |
| 4 | Stolen Plate | 15 | null | 2 | Stolen plate detected in parking lot |
| 5 | Camera 1 goes down | 16 | null | null | Camera 1 has lost connection! |

*See* '744 pat., col. 31; '314 pat., col. 28.

## *Fig. 2*



*See* '744 pat., fig. 2; '314 pat., fig. 2.

Table 5 "defines the alerts sent by the alerting engine." *See* '744 pat., col. 31:23-25; '314 pat., col. 28:35-37. "Alerts may be based on single or multiple occurrences of primitive events, single or multiple occurrences of compound events, or overall system-wide correlations." *See* '744 pat., col. 31:25-28; '314 pat., col. 28:37-40. The fourth column in Table 5, which has the heading "ThresholdValue," "specifies a threshold value

which triggers an alert (for correlated system-wide alerts, or null if an event-based alert)." *See* '744 pat., col. 31:39-41; '314 pat., col. 28:51-53. The fifth column in Table 5, which has the heading "ContactID," "specifies the group, or individual, that will receive the alert, or the set of actions that will be triggered by the alert." *See* '744 pat., col. 31:41-43; '314 pat., col. 28:53-55. The sixth and last column in Table 5, which has the heading "MsgTxt," "specifies the text of the message sent on an alert." *See* '744 pat., col. 31:43-44; '314 pat., col. 28:55-56.

As part of Table 5, "[a] user can pick events to extract from a sensor and fill the table for weights for a particular source, and the thresholds at which an alert will be generated[.]" *Response* [#56] at 39. As stated in the specifications by way of an example, "[a] user interface may be provided for an administrator, who can modify various system parameters, such as the primitive events being detected and recorded, the compound events and their definition in terms of primitive events, the attribute data, the rules, the thresholds, as well as the action components, alert destinations, contact lists, and group lists." *See* '744 pat., col. 39:42-48; '314 pat., col. 36:44-50.

Plaintiff illustrates this process by pointing to the "global alert" line in Table 5, which corresponds to a particular alert based on a system-wide correlation. *Response* [#56] at 40. The Specification explains that the first column's "AlertID=3," or "RuleID=3,"[7] in Table 5 corresponds to an alert on a global correlation having a nickname "Global Alert" (as shown in the second column) that is triggered when the overall system reaches a

---

[7] As far as the Court is able to determine, "AlertID" appears to be a scrivener's error, or potentially an unexplained synonym, which actually refers to the "RuleID" heading of the first column in Table 5. This apparent error appears to have been made in both of the patents at issue here. *See, e.g.*, '744 pat., cols. 31-32; '314 pat., cols. 28-29; *see also Order* [#65] at 12 n.11 (identifying the same issue). This issue does not materially affect resolution of the present Motion [#63].

threshold value of 61, ("ThresholdValue=61") in the fourth column, as calculated by a weighted sum of all events entering the system at a given time, and then "ContactID=7" in the fifth column "specifies the set of actions to be taken when the threshold value exceeds 61." *See* '744 pat., col. 31:65-32:25; '314 pat., col. 29:10-22. Plaintiff explains that using Table 5, along with Table 4 (the "Sources table") and Table 3 (the "Events table"), allows a user to "define a particular type of 'global alert'– i.e, an objective way to identify a critical alert that is based on the historical correlation and evaluation/calculation." *Response* [#56] at 40.

After thorough consideration of the parties' arguments and the underlying patents, the Court finds that Defendant has not shown by clear and convincing evidence that the term "critical events" is indefinite. The Court finds particularly persuasive the reasoning in *SEVEN Networks, LLC v. Google LLC*, Nos. 2:17-CV-442-JRG, 2:17-CV-441-JRG, 2018 WL 5263271, at *25-26 (E. D. Tex. Oct. 23, 2018), wherein the court determined that the term "not critical to user experience" was not indefinite. The plaintiff had defined the term "by the claim language itself, which makes it clear that an application is 'not critical to user experience' when the application is 'not identified on a whitelist.'" *Seven Networks, LLC*, 2018 WL 5263271, at *25. The court began its analysis by observing that, "[a]t first blush," the phrase appeared to be subjective and therefore indefinite. *Id.* However, the court noted that "the claims themselves provide an objective standard by explicitly defining 'non-critical' with reference to a 'whitelist.'" *Id.* at *26. The court found that "[a] fair reading is that the claims use 'non-critical' (as defined by referring to a whitelist) to define 'not critical to user experience,'" and that "[t]he reference to a 'whitelist' provides an objective standard for determining whether an application is 'not critical to user experience[.]'" *Id.*

The court rejected the defendants' argument that this reasoning was circular, because "[e]ven if subjective considerations may be involved in creating the whitelist, the whitelist nonetheless serves as an objective standard for evaluating whether a particular application is 'non-critical.'" *Id.* (emphasis omitted). The court further noted:

> [T]he limitation here at issue recites evaluating whether an application is "not critical to user experience" by checking whether the application is not on the whitelist. If the application is not on the whitelist, then the device concludes that the application is "not critical to user experience." If the application is on the whitelist, then the device concludes that the application is not "not critical to user experience." The limitation here at issue requires nothing more[.]

*Id.* (emphasis omitted). The court also contrasted the term at issue with the phrase "aesthetically pleasing," which another court had found to be indefinite because it was "completely dependent on a person's subjective opinion." *Id.*, at *25 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)). In addition, the court cited *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014), which had found the phrase "in an unobtrusive manner that does not distract a user" to be subjective and therefore indefinite. *Id.* Ultimately rejecting the defendants' indefiniteness argument, the *SEVEN Networks, LLC* court found that no further construction of the term "not critical to user experience" was necessary beyond its "plain meaning in light of surrounding claim language." *Id.* at *27.

In *Mobile Equity Corporation v. Walmart, Inc.*, No. 2:21-CV-00126-JRG-RSP, 2022 WL 218984, at *6-7 (E.D. Tex. Jan. 25, 2022), the defendant argued that the term "appropriate" in the context of the phrase "an appropriate financial institutions [sic] associated with the purchase account and the deposit account" was subjective and therefore indefinite. The plaintiff had argued that the "claim itself details with reasonable

18

certainty which financial institutions are the appropriate ones: the institutions that receive the instructions to initiate the transaction." *Mobile Equity Corp.*, 2022 WL 218984, at *7 (internal quotation marks omitted). The court found that "the 'appropriate' financial institutions are those that correspond to the identifying information of the intended transaction," citing as an example a figure from the claim which "describes how the mobile enablement center 'interrogates the registry . . . to identify an appropriate payment processing server 110." *Id.* (internal quotation marks omitted). That identification was "based on the routing numbers or other identification information associated with each financial institution." *Id.* The court therefore concluded that the term was not indefinite because "an 'appropriate financial institution' is one that corresponds to the identifying information associated with the financial institution." *Id.*

SEVEN *Networks, LLC* and *Mobile Equity Corporation* demonstrate that terms which facially appear subjective are not indefinite if there are objective standards for determining their meaning. Here, Plaintiff has shown that there are objective standards for determining the meaning of the term "critical events," which, in short, are "events that generate an alarm or trigger an action." *Brief* [#44] at 24. Simply because a user determines which events should trigger an alert does not make the term itself indefinite. The input is not "completely dependent on a person's subjective opinion." *See Seven Networks, LLC*, 2018 WL 5263271, at *25. Rather, as Plaintiff points out, in the context of the claims, the term signifies a class of events which causes the issuance of an alert. *Response* [#56] at 38. To paraphrase *SEVEN Networks, LLC*, 2018 WL 5263271, at *26, even if subjective considerations may be involved in creating the critical events listed in

Table 5, Table 5 nevertheless serves as an objective standard for evaluating whether an event is "critical."

Accordingly, the Court finds that Defendant has not shown by clear and convincing evidence that the term "critical events" is indefinite. The Court adopts Plaintiff's proposed construction of this term: "events that generate an alarm or trigger an action." *See Brief* [#44] at 24.

### 2.    Means-Plus-Function Terms

"Means-plus-function" refers to when a claim term is drafted in such a way as to invoke 35 U.S.C. § 112 ¶ 6.[8] *See Arason Enters., Inc. v. CabinetBed Inc.*, No. 16-cv-03001-PAB-NRN, 2018 WL 4698594, at *6 (D. Colo. Sept. 30, 2018); *see also Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022) (noting that "means-plus-function" is also referred to as "step-plus-function"). This statute provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. "Whether claim language invokes 35 U.S.C. § 112, ¶ 6 is a legal question of claim construction[.]" *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1341 (Fed. Cir. 2019) (internal footnote omitted).

Paragraph 6 of this statute "offers patent applicants two options: (1) recite, in the claim, a function without reciting structure for performing the function and limit the claims to the structure, materials, or acts disclosed in the specification (or their equivalents), in

---

[8] On September 16, 2012, this paragraph of the statute was restyled to 35 U.S.C. § 112(f) without any material changes. However, because the patents claim priority to 2007, i.e., before the restyling, the prior statute applies.

which case § 112 ¶ 6 applies, or (2) recite both a function and the structure for performing that function in the claim, in which case § 112 ¶ 6 is inapplicable." *Dyfan, LLC*, 28 F.4th at 1365.

"The overall means-plus-function analysis is a two-step process." *Id.* "The first step is to determine whether a claim limitation is drafted in means-plus-function format, which requires us to construe the limitation to determine whether it connotes sufficiently definite structure to a person of ordinary skill in the art." *Id.* "If the limitation connotes sufficiently definite structure, it is not drafted in means-plus-function format, and § 112 ¶ 6 does not apply." *Id.*

"If, however, we conclude that the limitation is in means-plus-function format, we perform the second step of determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" *Id.* (quoting *Williamson*, 792 F.3d at 1351). The second step itself consists of two determinations. *See Williamson*, 792 F.3d at 1351. First, the Court must "identify the claimed function." *Id.* Second, the Court "must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.* "If the patentee fails to disclose adequate corresponding structure, the claim is indefinite." *Id.*

"Means-plus-function" analysis is a type of indefiniteness argument. *See, e.g.*, *E-Numerate Sols., Inc.*, 170 Fed. Cl. at 154-55 (stating that "[t]his claim construction Order solely addresses indefiniteness" and discussing means-plus-function claims). Thus, Defendant bears the burden of proof by clear and convincing evidence as to these terms. *See id.* at 154 ("Indefiniteness must be proven by clear and convincing evidence." (citation omitted)).

### a.    Step One: Means-Plus-Function Format in Claim Limitation

The parties disagree whether § 112 ¶ 6 applies to the four terms at issue here, i.e., "sensory event analytics module," "legacy event analytics module," "correlation module," and "alerting module." *Brief* [#44] at 17-19; *Response* [#56] at 13-18, 30-32, 34, 35-37; *Reply* [#62] at 2-3.

### i.    The Terms at Issue

In the '744 Patent, the terms at issue are all found in Claim One, which begins: "What is claimed is: 1. A monitoring system comprising a non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement" the four modules at issue here. '744 pat., col. 50:11-16.

First, the system implements "a sensory event analytics module to receive sensory data about a physical environment from one or more sensors and to process the sensory data from the one or more sensors to detect one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events is selected from the group consisting of a person detected, a face detected, a vehicle detected, and a license plate detected[.]" '744 pat., col. 50:17-25.

Second, the system implements "a legacy event analytics module to receive legacy system data from one or more legacy systems and to process the legacy system data from the one or more legacy systems to detect one or more legacy events, wherein the one or more legacy systems is selected from the group consisting of an access control

22

system, a personnel system, a license plate system, an inventory system, a law enforcement system, and a lighting system[.]" '744 pat., col. 50:26-33.

Third, the system implements an event queue, which is not at issue in the present Motion [#63]. '744 pat., col. 50:34-37.

Fourth, the system implements "a correlation module to calculate one or more historical correlations by automatically analyzing the stored sensory events and the stored legacy events across at least one of time and space, wherein the correlation module is adapted to monitor continuously and in real-time the sensory events and the legacy events to identify one or more critical events, and wherein the one or more critical events are based at least on the one or more sensory historical correlations among the stored sensory events and the stored legacy events[.]" '744 pat., col. 50:38-47.

Fifth and finally, the system implements "an alerting module to send one or more alerts based on the one or more critical events." '744 pat., col. 50:48-49.

The '314 Patent does not have "legacy event analytics module" as a term at issue. *See* '314 pat., col. 47:18-59. Rather, the '314 Patent only concerns "sensory event analytics module," "correlation module," and "alerting module." *Id.* The parties do not argue that any minor word differences between the '744 Patent and the '314 Patent are material to the Court's claim construction of these three terms.

### ii.   The Step One Legal Framework

"[T]he use of the word 'means' in a claim element creates a rebuttable presumption that § 112, para. 6 applies." *Williamson*, 792 F.3d at 1348 (citing *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703-04 (Fed. Cir. 1998)). Here, none of the terms at issue employ this word. '744 Patent, 50:17-49; '314 Patent, 47:23-

59. Thus, the Court "appl[ies] a rebuttable presumption that the term conveys sufficiently definite structure and is not subject to § 112, ¶ 6." *MTD Prods. Inc.*, 933 F.3d at 1341. Although Defendant bears the overall burden of demonstrating indefiniteness by clear and convincing evidence, *see E-Numerate Sols., Inc.*, 170 Fed. Cl. at 154-55, Defendant at this step bears the burden of rebutting the rebuttable presumption by the lower "preponderance of the evidence" standard, *see Williamson*, 792 F.3d at 1348.

To rebut the presumption, Defendant must demonstrate "that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). "In making the assessment of whether the limitation in question is a means-plus-function term subject to the strictures of § 112, para. 6, [the Federal Circuit has] emphasized that the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348 (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)).

One way for Defendant "to demonstrate that a claim limitation fails to recite sufficiently definite structure is to show that, although not employing the word 'means,' the claim limitation uses a similar 'nonce word that can operate as a substitute for "means" in the context of § 112, para. 6.'" *MTD Prods. Inc.*, 933 F.3d at 1341 (quoting *Williamson*, 792 F.3d at 1350). A "generic term" such as "module," which is at issue in each of the terms in this case, may be "commonly used as [a] verbal construct[ ] that operate[s], like 'means,' to claim a particular function rather than describe a 'sufficiently definite

24

structure.'" *Id.* (citing *Williamson*, 792 F.3d at 1350 (stating that "module" is a nonce term because it "sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used")). "[A] critical question is whether 'the claim term,'" which, again, here is "module," "is used in common parlance or by persons of skill in the pertinent art to designate structure,' including either a particular structure or a class of structures." *Id.* (quoting *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017)). If the term is so used, then § 112, ¶ 6 is not invoked. *See, e.g.*, *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013).

In *Rain Computing, Inc. v. Samsung Electronics America, Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021), the Federal Circuit determined that the term "user identification module" was a means-plus-function term subject to § 112 ¶ 6. The Circuit first noted that the word "module" there did "not provide any indication of structure" and that the plaintiff did not "point to any claim language providing any structure for performing the claimed function of being configured to control access." *Rain Computing, Inc.*, 989 F.3d at 1006. Next, the Circuit found that the prefix "user identification" did not "impart structure because it merely describes the function of the module: to identify a user." *Id.* Thus, the Circuit held that the claim language alone did not "provide any structure for performing the claimed functions." *Id.*

The Circuit next turned to whether the full term "user identification module" had a "commonly understood meaning" or was "generally viewed by one skilled in the art to connote a particular structure." *Id.* The parties had agreed that neither of these was applicable. *Id.* In connection with this analysis, the Circuit looked to the specification to determine whether it "impart[ed] any structural significance to the term[.]" *Id.* In doing so,

it looked to whether "the claims, when read in light of the specification, provide sufficient structure for the [ ] term." *Id.* (quoting *Media Rights Techs., Inc. v. Cap. One Fin. Corp.*, 800 F.3d 1366, 1373 (Fed. Cir. 2015)). Finding that they did not, the Circuit held that "user identification module" was a means-plus-function term subject to § 112 ¶ 6.

The Court notes that Defendant here appears to argue that the specification has no role in determining whether a means-plus-function term is subject to § 112 ¶ 6. *See Reply* [#62] at 2 n.4. This is not entirely true. In *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296 (Fed. Cir. 2014), *overruled on other grounds by Williamson*, 792 F.3d at 1349, the Federal Circuit stated that "the first step in the means-plus-function analysis requires us to determine whether the entire claim limitation at issue connotes 'sufficiently definite structure' to a person of ordinary skill in the art," and that, "[i]n so doing, [courts] naturally look to the specification, prosecution history, and relevant external evidence to construe the limitation." *Apple, Inc.*, 757 F.3d at 1296. The Circuit acknowledged that "this inquiry may be similar to looking for corresponding structure in the specification" but held that its "precedent requires it when deciding whether a claim limitation lacking means connotes sufficiently definite structure to a person of ordinary skill in the art." *Id.* The Circuit pointed out that the step one and step two "inquiries are distinct," and therefore "it is possible to find that a claim limitation does not connote sufficiently definite structure despite the presence of some corresponding structure in the specification." *Id.* at 1297.

In short, therefore, a term is a means-plus-function term subject to § 112 ¶ 6 when the term is not defined and does not connote sufficiently definite structure to a POSITA. *See Apple, Inc.*, 757 F.3d at 1299 (stating that a claim "limitation has sufficient structure when it recites a claim term with a structural definition that is either provided in the

specification or generally known in the art"). However, what precisely is "structure" in the realm of computer-implemented inventions? In *Apple, Inc.*, the Federal Circuit noted that "looking for traditional 'physical structure' in a computer software claim is fruitless because software does not contain physical structures." 757 F.3d at 1298. "[T]he typical physical structure that implements software, a computer, cannot be relied upon to provide sufficiently definite structure for a software claim lacking 'means.'" *Id.* "Rather, to one of skill in the art, the 'structure' of computer software is understood through, for example, an outline of an algorithm, a flowchart, or a specific set of instructions or rules." *Id.* (citing *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) ("[T]he patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function.")). "Structure may also be provided by describing the claim limitation's operation, such as its input, output, or connections." *Apple, Inc.*, 757 F.3d at 1299 (stating that "[t]he limitation's operation is more than just its function; it is how the function is achieved in the context of the invention").

With these legal principles in mind, the Court turns to the four module terms at issue.

### iii.   Step One Analysis

Here, for the reasons discussed below, the Court finds that Defendant has shown that § 112 ¶ 6 applies to the three terms, "sensory event analytics module," "legacy event analytics module," and "alerting module" but has failed to show that § 112 ¶ 6 applies to the term "correlation module." *See, e.g.*, *CellCast Techs., LLC v. United States*, 150 Fed. Cl. 353, 380-81 (Fed. Cl. 2020) (discussing the relevant framework).

The Court finds that it does not have to look beyond the claim limitation to find that "correlation module" is not a means-plus-function term, given that the limitation itself contains an algorithm. *See* '744 pat., col. 50:42-47. An algorithm may take several forms, including a written explanation of the algorithm's structure. *CellCast Techs., LLC*, 150 Fed. Cl. at 380 ("The algorithmic structure need not be the operative source code itself.") (citing *Typhoon Touch Techs., Inc.*, 659 F.3d at 1385-86 ("For computer-implemented procedures, the computer code is not required . . . . A description of the function in words may disclose, at least to the satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary structure[.]") (internal quotation marks omitted)). Here, the claim language includes an algorithm showing how the "calculation," *see* '744 pat., col. 50:38, or "evaluation," *see* '314 pat., col. 47:45, is performed. *See* '744 pat., col. 50:42-47. Plaintiff's expert Dr. Shirvaikar confirms this finding as a POSITA, stating that the algorithm in the limitation consists of: "(a) continuous monitoring; (b) in real-time; (c) of the stored events; (d) across at least one of time and space; (e) to identify a critical event; (f) and where the critical event is based on one or more historical correlations among the stored sensory events and the stored legacy events." *See* [#56-1] ¶¶ 9, 22. Given that the claim limitation contains this algorithm and that there is supporting evidence for this finding, the Court need look no further at the specification itself and finds that the term "correlation module" is not subject to § 112 ¶ 6. *See Apple, Inc.*, 757 F.3d at 1300 ("[I]f a limitation recites a term with a known structural meaning, or recites either a known or generic term with a sufficient description of its operation, the presumption against means-plus-function claiming remains intact.").

28

However, the Court finds that the other three terms ("sensory event analytics module," "legacy event analytic module," and "alerting module") are subject to § 112 ¶ 6. *See, e.g.*, *WSOU Invs. LLC*, 2023 WL 6210607, at *3-5 (finding that a term similar to "alerting module," i.e., "alerting unit," was a means-plus-function limitation subject to 35 U.S.C. § 112 ¶ 6, given that the language in the claim at issue was "purely functional and [did] not connote any structure"). These terms do not include an algorithm or sufficiently definite structure in the claim limitation. *See* '744 pat., col. 50:17-33, 48-49.

Dr. Shirvaikar's Declaration [#56-1] addresses only the term "sensory event analytics module." *See* [#56-1] ¶ 12. He states that, "based on [his] experience and the review of the words in the claims," he "would have understood in 2007 what is meant by" the term as a POSITA. *Id.* ¶¶ 7-9, 16. However, simply understanding the meaning of the term is not what is at issue here. Rather, the issue is whether the term "is understood as the name for *structure*." *Williamson*, 792 F.3d at 1351. In *Williamson*, the Federal Circuit held that testifying that structure "could be in software or it could be in hardware" was insufficient, because even if a POSITA "could program a computer to perform the recited functions," the POSITA could not "create structure where none otherwise is disclosed." *Id.* Here, Dr. Shirvaikar defines "sensory analytics module" as "either software or hardware that receives and analyzes sensor data for events, program code or software in sensors that analyzes sensor data for events, or a video analytics device." *See* [#56-1] ¶ 16. In light of *Williamson*, the Court finds this definition insufficient and attempts to "create structure where none otherwise is disclosed." *See* 792 F.3d at 1351; *see also id.* at 1350 (noting that a generic description of hardware or software that performs a specified function does not connote sufficiently definite structure).

Further, Plaintiff's reference to the IBM paper with respect to its arguments on "sensory event analytics module" and "legacy event analytics module" does not change the Court's analysis. *See, e.g.*, *Response* [#56] at 13, 36. This 2005 paper predates the Asserted Patents' 2007 priority date by two years. *See Response* [#56] at 5; '744 pat., p. 2, col. 1, *ll.* 7-8, 44-48; '314 pat., p.2, col. 1, *ll.* 9-18. Plaintiff's counsel repeatedly referenced this paper as being well-known in the industry and as containing information which would have been well-known to a POSITA in 2007. *See, e.g.*, *Tr.* [#88] 27:12-19, 28:18-24, 29:5-30:19; *Response* [#56] at 13 ("Finally, a skilled artisan in 2007 would have known exactly what a 'sensory event[ ] analytics module' connoted (*see* IBM Paper)."), 36 ("The legacy event analytics module was also well known in the art in 2007 (*see* IBM paper, referring to a badge reader)."). However, while certainly plausible and very well possibly true, the Court finds that the evidentiary predicate for this statement has not been sufficiently laid. In other words, it is not clear to the Court that a POSITA *would* have been aware of the IBM paper and its contents. For example, Plaintiff asserts that "a skilled artisan in 2007 would have known exactly what a 'sensory event[ ] analytics module' connoted (*see* IBM Paper)." *Response* [#56] at 13. Plaintiff supports this sentence with a citation to paragraph 19 of Dr. Shirvaikar's Declaration [#56-1]. *Id.* at 13 n.33. However, while Dr. Shirvaikar asserts that "[a] skilled artisan in 2007 would have known exactly what a 'sensory event[ ] analytics module' connoted," there is no reference in paragraph 19 (or anywhere else in the Declaration [#56-1]) to the IBM paper to support the assertion that a POSITA would have known about it and been familiar with its contents. Although the IBM paper is referenced in the patents themselves under the heading "References Cited: Other Publications," *see* '744 pat., p. 4; '314 pat., p. 3, the Court is aware of no

30

legal authority, and Plaintiff has provided none, to demonstrate that this, alone, is enough to show that a POSITA would have known about and been familiar with the contents of the paper.

The Court's analysis is also not altered by Plaintiff's citation to the McGraw Hill Computer Desktop Encyclopedia, copyrighted 2001, defining "module," even though it predates the Asserted Patents' 2007 priority date by six years. *Response* [#56] at 8 n.20 (citing *Ex. 5* [#56-6]). This source, which billed itself as "The Most Comprehensive A-Z Computer Reference Available" at the time, defines "module" as follows: "A self-contained hardware or software component that interacts with a larger system. Hardware modules are often made to plug into a main system. Program modules are designed to handle a specific task within a larger program." *Ex. 5* [#56-6] at 1, 3. However, again, simply understanding the meaning of the term is not what is at issue here. Rather, the issue is whether the term "is understood as the name for *structure*." *Williamson*, 792 F.3d at 1351. A generic description of hardware or software performing a specified function does not connote sufficiently definite structure. *Id.* at 1350. Thus, if anything, this definition favors Defendant's argument that "module," when standing alone, is a "nonce" word. *See MTD Prods. Inc.*, 933 F.3d at 1341.

Accordingly, the Court finds that Defendant has rebutted the presumption against means-plus-function treatment with respect to the terms "sensory event analytics module," "legacy event analytics module," and "alerting module," as Defendant has "demonstrate[d] that the claim term fails to recite sufficiently definite structure." *See Williamson*, 792 F.3d at 1349 (internal citation and quotations omitted).

### b.    Step Two: Structure of Claimed Function in Specification

Because the Court has concluded that "module" as used in three of the four terms is a means-plus-function term, the Court turns to the construction of those terms under step two. *See Rain Computing, Inc.*, 989 F.3d at 1007. As noted above, this second step consists of two determinations. *See Williamson*, 792 F.3d at 1351. First, the Court must "identify the claimed function." *Id.* Second, the Court "must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.*

### i.    Identification of the Claimed Function

Under step two, the Court must first "determine the claimed function." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (quoting *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006)). Here, the parties explicitly agree on the claimed function of each term. *See Reply* [#62] at 2 ("The Parties agree on the function of the Module Terms[.]"). Those functions are as follows.

The function of a "legacy event analytics module" is "to receive legacy system data from one or more legacy systems and to process the legacy system data from the one or more legacy systems to detect one or more legacy events, wherein the one or more legacy systems is selected from the group consisting of an access control system, a personnel system, a license plate system, an inventory system, a law enforcement system, and a lighting system." *Response* [#56] at 38; '744 pat., cl. 1; *see also Brief* [#44] at 16.

The function of an "alerting module" is "to send one or more alerts based on the one or more critical events." *Response* [#56] at 35; '744 pat., cl. 1; '314 pat., cl. 1; *see also Brief* [#44] at 16.

The function of a "sensory event analytics module" is "to receive sensory data about a physical environment from one or more sensors and to process the sensory data from the one or more sensors to detect one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events is selected from the group consisting of a person detected, a face detected, a vehicle detected, and a license plate detected." *Response* [#56] at 17; '744 pat., cl. 1; '314 pat., cl. 1; *see also Brief* [#44] at 15.

## ii.   Corresponding Structure in the Specification

In the second part of step two, the Court must "must identify the corresponding structure in the written description of the patent that performs the function." *Noah Sys., Inc.*, 675 F.3d at 1311 (quoting *Applied Med. Res. Corp.*, 448 F.3d at 1332). "To determine whether a means-plus-function term discloses sufficient structure, the relevant inquiry is 'to look at the disclosure of the patent and determine if one of skill in the art would have understood that disclosure to encompass' the technology at issue." *Arason Enters., Inc.*, 2018 WL 4698594, at *6 (quoting *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) (quoting *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003))). "It is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent." *Blackboard, Inc.*, 574 F.3d at 1385.

"[I]f a patentee has invoked computer-implemented means-plus-function claiming, the corresponding structure in the specification for the computer implemented function must be an algorithm unless a general purpose computer is sufficient for performing the function." *Apple, Inc.*, 757 F.3d at 1298 (emphasis omitted).

33

### (a)     Legacy Event Analytics Module

To reiterate, the claim limitation for "legacy event analytics module" for the '744

Patent provides:

> What is claimed is: 1. A monitoring system comprising a non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement . . . a legacy event analytics module to receive legacy system data from one or more legacy systems and to process the legacy system data from the one or more legacy systems to detect one or more legacy events, wherein the one or more legacy systems is selected from the group consisting of an access control system, a personnel system, a license plate system, an inventory system, a law enforcement system, and a lighting system[.]

'744 pat., col. 50:11-16, 26-33. The Court must determine whether there is structure

corresponding to this claim limitation in the specification. *See Noah Sys., Inc.*, 675 F.3d

at 1311.

In the claim construction chart, Plaintiff directs the Court's attention to two

passages and one figure in the specification. *Brief* [#44] at 16 (citing '744 pat., fig. 12

(1209), cols. 2:61-64, 5:19-26). The first passage provides: "The program code also

implements a legacy event analytics module to receive legacy system data from one or

more legacy systems and to process the legacy system data from the one or more legacy

systems[.]" '744 pat., col. 2:61-64. The second passage provides: "The program code

also implements a legacy event analytics module to receive legacy system data from one

or more legacy systems and to process the legacy system data from the one or more

legacy systems to detect one or more legacy events, wherein the one or more legacy

systems is selected from the group consisting of an access control system, an inventory

system, a financial system, a law enforcement system, and a lighting system." '744 pat.,

34

col. 5:19-26. Figure 12 of the '744 Patent demonstrates at 1209 where the legacy event analytics module fits into the larger structure of the invention:

## *Fig. 12*



*See* '744 pat., fig. 12; '314 pat., fig. 12.

In its Response [#56], Plaintiff points to several other parts of the specification. First, Plaintiff points to language that "[l]egacy and other systems also give rise to primitive events. For example, a card access system generates a 'swipe card detected' event with the corresponding unique card number whenever a card is swiped." *Response* [#56] at

35-36 n.85; '744 pat., col. 8:9-12.[9] Second, Plaintiff points to language that "[n]umerous legacy systems, such as card access system 111, personnel system 112, etc. may be integrated into system 100 by the use of an appropriate normalization engine . . . . These legacy systems provide important 'meta-data' events, such as 'person A swipes into Building B,' etc. The legacy systems also provide important information to the correlation engine, for example, 'person A is a registered student,' 'person B is a faculty member,' etc." *Response* [#56] at 36 n.86; '744 pat., col. 10:15-23. "111," "112," and "100" all refer to Figure 1:

---

[9] Except where noted, Plaintiff cites the language of the '616 Patent throughout its Response [#56]. *See* [#56] at 10 n.24. However, as stated above, the parties have reached settlement as to the '616 Patent and it is no longer at issue in this lawsuit. Therefore, the Court has examined the references provided by Plaintiff to the '616 Patent but has instead located and referred to the identical language in the '744 Patent.



*Fig. 1*

*See* '744 pat., fig. 1; '314 pat., fig. 1. Third and finally, Plaintiff points to the following specification language which also refers to Figure 1: "Legacy Systems. Interfaces to the following legacy systems or external systems may be provided by adding an appropriate normalization engine to the system 100 of FIG. 1." *Response* [#56] at 37 n.87; '744 pat., 44:24-27.

Citing the 2005 IBM Paper [#56-5], Plaintiff argues that the legacy event analytics module was "well known in the art in 2007[.]" *Response* [#56] at 36. Plaintiff states that "[t]he module merely *records* an event provided from a legacy system," and that, "[i]n that way, it is no different than a temperature probe that records temperatures." *Id.* (emphasis in original). Plaintiff also points to Figure 12, stating that "[o]ne embodiment shows the architecture including the connection of the legacy systems to the computer process of the claimed invention," and that "[t]he legacy system connects via additional software and hardware necessary to record events detected by the legacy system[.]" *Id.* In sum, Plaintiff states that "the structure is the communication link between the legacy system and the normalization engine (see Fig. 1 or Fig. 12)" and that "[t]he algorithm is the transfer of data via a communication link." *Id.* at 38.

The Court notes that the structure to which Plaintiff points is thin. In fact, much of the written description is largely a reiteration of the claim language. *Compare, e.g.*, '744 pat., col. 50:11-16, 26-33 *with* '744 pat., col. 5:19-26. However, the Court is not convinced that a significant amount of structure is required here. For basic computer-implemented functions, the definite structure for performing the function is the computer itself. *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). General functions such as processing, receiving, and storing "can be achieved by any general purpose computer without special programming," and those functions "are coextensive with the structure disclosed, i.e., a general purpose processor." *Id.* (quotation marks omitted). Here, although the Court found above that *some* structure is required for a legacy event analytics module, much of this module consists of basic computer-implemented functioning, for which no structure is needed. Thus, when this consideration

38

is combined with Figure 12, the Court finds that Plaintiff has shown that the specification contains at least *some* algorithmic structure.

Defendant argues that this structure is insufficient. *Reply* [#62] at 6. That well may be. However, that argument is premature. This is a classic "some disclosed algorithm" situation under *EON Corporation IP Holdings v. AT & T Mobility LLC,* 785 F.3d 616 (Fed. Cir. 2015), and therefore "arguments regarding the sufficiency of the disclosed algorithms must be evaluated according to expert testimony" based on the perspective of a POSITA, *CellCast Techs., LLC*, 150 Fed. Cl. at 381. *See EON Corp.*, 785 F.3d at 623-24 (distinguishing situations where a skilled artisan's knowledge is irrelevant because the specification discloses no algorithm from situations where the skilled artisan's perspective is relevant to assess the sufficiency of the algorithm's disclosure). Thus, the evaluation of whether the claim is indefinite pursuant to § 112 ¶ 6 must be "left for summary judgment, allowing the parties the ability to conduct expert discovery proceedings and present all necessary arguments and evidence." *CellCast Techs., LLC*, 150 Fed. Cl. at 381. The Court finds that Defendant has not shown by clear and convincing evidence at this stage of the proceedings that "legacy event analytics module" is indefinite.

### (b)    Alerting Module

The claim term "alerting module" is found in the '314 Patent, Claim 1, and the '744 Patent, Claim 1. Plaintiff's proposed construction is "program code or a software component that sends an alert." *Brief* [#44] at 16 (citing '744 pat., cols. 3:16-18, 5:41:43). Defendant asserts that "[t]he specification fails to sufficiently disclose a structure corresponding to the recited function, rendering this phrase indefinite." *Id*.

To reiterate, the claim limitation for "alerting module" for the '744 Patent provides:

> What is claimed is: 1. A monitoring system comprising a non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement . . . an alerting module to send one or more alerts based on the one or more critical events.

'744 pat., col. 50:11-16, 48-49. The Court must determine whether there is structure corresponding to this claim limitation in the specification. *See Noah Sys., Inc.*, 675 F.3d at 1311.

In the claim construction chart, Plaintiff directs the Court's attention to two passages in the specification. *Brief* [#44] at 16 (citing '744 pat., cols. 3:16-18, 5:41-43). The first passage provides: "Finally, the program code also implements an alerting module to send one or more alerts based on the one or more critical events." '744 pat., col. 3:16-18. The second passage is identical to the first. '744 pat., col. 5:41-43.

In its Response [#56], Plaintiff points to one other part of the specification, language stating: "Finally, alert/action engine 121 issues one or more alerts or performs one or more actions 123 based on the rules evaluated by the rule evaluation module 214." *Response* [#56] at 33 n.84; '744 pat., col. 13:4-6. References to "121," "123," and "214" refer to Figure 1, provided above in Section III.E.2.b.ii.(a), and the reference to "214" refers to Figure 2, provided above in Section III.E.2.a.

Plaintiff asserts that "[a]larms triggered from sensors measurements, for example a fire alarm, have been ubiquitous for a very long time," and that "[a]n alerting module is the alarm system that issues a particular alert." *Response* [#56] at 33. Plaintiff notes that "[t]he Specification doesn't talk much about this alarm system except to describe[ ] what type of signal or command that it receives from the correlation module: an alert/action

engine 121 issues one or more alerts or performs one or more actions 123 based on the rules evaluated by the rules evaluation module 214[.]" *Id.* (citing fig. 1).

Plaintiff also discusses Table 5, *see supra* § III.E.2.a., which "shows an illustrative rules table that lists the types of alerts sent as text messages based on certain events, like sending a message (124) or moving a camera (123)." *Response* [#56] at 34. Plaintiff asserts that, when "construed in the context of the entire claim," an alerting module "is software that merely receives a signal or instruction to send a particular alert." *Id.* In support, Plaintiff points to Figure 13B, which "illustrat[es] a continuation of process 1300, show[ing] that step 1338 'generates one or more alerts or perform[s] one or more actions based on the evaluated rules.'" *Id.*

## *Fig. 13B*

<u>1300</u>



*See* '744 pat., fig. 13B; '314 pat., fig. 13B. In short, Plaintiff concludes that the

corresponding structure in the specification "is CPU 1109 running program code on RAM

1106," and that "[t]he algorithm is the 'arrow' between 1336 and 1338 (i.e., a command or signal) and the performance of the alert or action as specified in a table, for example, Table 5." *Response* [#56] at 35. "1109" and "1106" refer to Figure 11:

## *Fig. 11*



*See* '744 pat., fig. 11; '314 pat., fig. 11.

Here again, the Court notes that the structure to which Plaintiff points is thin. However, again, the Court is not convinced that a significant amount of structure is required here. As noted above, for basic computer-implemented functions, the definite structure for performing the function is the computer itself. *In re Katz*, 639 F.3d at 1316. Here, although the Court found above that *some* structure is required for an alerting module, much of this module consists of basic computer-implemented functioning, for which no structure is needed. Thus, when this consideration is combined with the referenced figures, the Court finds that Plaintiff has shown that the specification contains at least *some* algorithmic structure.

Again, Defendant argues that this structure is insufficient. *Reply* [#62] at 6. That well may be. However, that argument again is premature. This is another classic "some disclosed algorithm" situation under *EON Corporation*, and therefore "arguments regarding the sufficiency of the disclosed algorithms must be evaluated according to expert testimony" based on the perspective of a POSITA. *CellCast Techs., LLC*, 150 Fed. Cl. at 382. Thus, the evaluation of whether the claim is indefinite pursuant to § 112 ¶ 6 must be "left for summary judgment, allowing the parties the ability to conduct expert discovery proceedings and present all necessary arguments and evidence." *Id.* The Court finds that Defendant has not shown by clear and convincing evidence at this stage of the proceedings that "alerting module" is indefinite.

### (c)   Sensory Event Analytics Module

The claim term "sensory event analytics module" is found in the '314 Patent, Claim 1, and the '744 Patent, Claim 1. Plaintiff's proposed construction is "either software or hardware that receives and analyzes sensor data for events, program code or software

in sensors that analyzes sensor data for events, or a video analytics device." *See Response* [#56] at 12; *Def.'s Markman Hearing Powerpoint Presentation, Slide 8*. This new proposed construction is an amendment to the original proposed construction provided in the previously submitted Brief [#44]. *See id.*; *Tr.* [#88] at 62:22-63:2; *Brief* [#44] at 15-16 (citing '744 pat., fig. 1 (104), fig. 5 (502), fig. 7 (722), fig. 12 (1207), fig. 13A, cols. 9:43-57, 10:28-30, 41:14-31).[10] Defendant asserts that "[t]he specification fails to sufficiently disclose a structure corresponding to the recited function, rendering this phrase indefinite." *Brief* [#44] at 15-16.

To reiterate, the claim limitation for "sensory event analytics module" for the '744 Patent provides:

> What is claimed is: 1. A monitoring system comprising a non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement: a sensory event analytics module to receive sensory data about a physical environment from one or more sensors and to process the sensory data from the one or more sensors to detect one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events is selected from the group consisting of a person detected, a face detected, a vehicle detected, and a license plate detected[.]

'744 pat., col. 50:11-25. The Court must determine whether there is structure corresponding to this claim limitation in the specification. *See Noah Sys., Inc.*, 675 F.3d at 1311.

---

[10] These citations were technically made in connection with the original proposed construction, but the record contains no indication that they do not equally apply to the new construction. *See, e.g.*, *Tr.* [#88] at 62:24-63:2 (Defendant summarizing the change in construction as simply "expanded . . . to include hardware").

In the claim construction chart, Plaintiff directs the Court's attention to three passages and five figures in the specification. *Brief* [#44] at 15-16 (citing '744 pat., fig. 1 (104), fig. 5 (502), fig. 7 (722), fig. 12 (1207), fig. 13A, cols. 9:43-57, 10:28-30, 41:14-31). The first passage provides:

> Analogue surveillance camera 102 captures video data, which is digitized by DVR 103. Video analytics device 104 detects primitive video events ("meta-data") in the video data. The primitive video events, represented by line 140, may include such events as "person detected," "vehicle detected," etc., and are explained in detail below. Digital surveillance camera 105 (which could be an IP camera) also captures video data. Video analytics device 106 detects primitive video events ("meta-data") in the video data. Although only two surveillance cameras are shown, the present invention may be applied to any number and combination of analogue and digital surveillance cameras. The video analytics devices may consist of software running on a general purpose hardware device. Audio sensory devices 107 capture audio data[.]

'744 pat., col. 9:43-57. "102," "103," "104," "140," "105," "106," and "107" all refer to Figure 1, provided above in Section III.E.2.b.ii.(a).

The second passage provides: "If a vehicle is detected in the video by video analytics device 104 or 106, vehicle information module 113 retrieves information about the vehicle from one or more law enforcement databases (not shown in FIG. 1)." '744 pat., col. 10:27-31. "104," "106," and "113" all refer to Figure 1, provided above in Section III.E.2.b.ii.(a).

The third passage provides:

> Video analytics server 1207 provides the video analytics device functionality described above, as well as providing the interface to search, retrieve, and analyze the video data by event stored on data server 1208.

> The video, including live feeds, as well as recorded video, may be viewed on smart display matrix 1205. The display matrix includes one or more monitors, each monitor capable of displaying multiple cameras or video views simultaneously. One or more clients are provided to view live video

data, as well as to analyze historical video data. Supported clients include PDA 1201 (such as an Apple iPhone®), central client 1202, and smart client 1203. A remote client 1204 may be connected remotely from anywhere on the network or even over the public Internet, due to the open IP backbone of the present invention. FIG. 12 is illustrative of but one hardware architecture compatible with the principles of the present invention, and is not intended to limit the scope of the present invention.

'744 pat., col. 41:14-31. "1207," "1205," "1201," "1202," "1203," and "1204" all refer to Figure 12, provided above in Section III.E.2.b.ii.(a).

In addition to Figures 1 and 12, Plaintiff refers to three other figures. *Brief* [#44] at 15. In Figure 5, Plaintiff refers to "502," the license plate recognition module:





*See* '744 patent, fig. 5; '314 pat., fig. 5. In Figure 7, Plaintiff refers to "722," the analytics

server:

## *Fig. 7*



*See* '744 pat., fig. 7; '314 pat., fig. 7. Plaintiff also generally refers to the entirety of Figure 13A:



*Fig. 13A*

1300

START — 1302

CAPTURE VIDEO DATA FROM ONE OR MORE SURVEILLANCE CAMERAS — 1304

CAPTURE AUDIO DATA FROM ONE OR MORE AUDIO SENSORY DEVICES — 1306

DETECT PRIMITIVE VIDEO EVENTS IN THE VIDEO DATA BY PERFORMING IMAGE PROCESSING ON THE VIDEO DATA — 1308

DETECT AUDIO EVENTS IN THE AUDIO DATA BY PERFORMING AUDIO PROCESSING ON THE AUDIO DATA — 1310

RECEIVE VIDEO TIPS FROM ONE OR MORE EXTERNAL SOURCES — 1312

GENERATE TIP EVENTS FROM META-DATA AND ATTRIBUTE DATA EXTRACTED FROM THE VIDEO TIPS — 1314

STORE THE VIDEO DATA, THE AUDIO DATA, AND THE VIDEO TIPS IN A HIERARCHY OF TWO OR MORE DATA STORAGE DEVICES — 1316

CASCADE THE VIDEO DATA FROM A FIRST-LEVEL STORAGE DEVICE TO A SECOND-LEVEL STORAGE DEVICE BASED AT LEAST ON IMPORTANCE OF THE VIDEO DATA — 1318

FIG. 13B

*See* '744 pat., fig. 13A; '314 pat., fig. 13A.

50

In its Response [#56], Plaintiff points to five additional passages in the specification.[11] First, Plaintiff points to the following language:

> According to the present invention, various video analytics devices may be used to generate meta-data, or detect primitive video events, from the video data. These video analytics devises may be configured to detect any number of primitive video events. Some illustrative primitive video events are listed below. However, the present invention is not limited to these primitive video events, and various video analytics devices may be used to determine one or more primitive video events, and are all within the scope of the present invention.
>> 1. Presence of intruder in restricted area during restricted time (excludes false alarms due to pets, wind blowing, trees moving, etc.)
>> 2. Person or vehicle enters a designated area during a designated time
>> 3. Person or vehicle leaves a designated area during a designated time
>> 4. Object left in a restricted area during a designated time
>> 5. Object taken from a designated area during a designated time
>> 6. Vehicle in a restricted area during a restricted time
>> 7. Vehicle driving the wrong way in a designated lane during a designated time
>> 8. Person or vehicle loitering in a designated area during a designated time
>> 9. Speed of motion of an object
>> 10. Size of object
>> 11. Area of motion of object
>> 12. Acceleration of object
>> 13. A face detected
>> 14. Type of vehicle detected (SUV, car, convertible, etc.)
>> 15. License plate of a vehicle
>> 16. Speed of a vehicle

*Response* [#56] at 9 n.21; '744 pat., col. 42:53-43:18. Second, Plaintiff points to language stating: "In another example, a 3 Megapixel camera would be weighted higher than a VGA camera for purposes of face recognition or license plate recognition." *Response* [#56] at 9 n.21; '744 pat., col. 30:40-42. Third, Plaintiff points to language stating:

---

[11] The Court was unable to find in either the '744 Patent or the '314 Patent the language cited from the '616 Patent at column 2:23-26. *See Response* [#56] at 10 n.27. However, this language does not materially affect resolution of the present Motion [#63].

"Primitive events may be generated automatically by various sensory devices, or may be generated in software based on data from the sensory devices. For example, a camera may generate an event corresponding to the presence of a person." *Response* [#56] at 10 n.25; '744 pat., col. 8:13-17. Fourth, Plaintiff points to language stating: "Video analytics devices are used to extract relevant events from the video data, and are input into the correlation engine. Input may also come from other systems, such as other sensory devices (e.g., temperature and pressure probes)." *Response* [#56] at 10 n.26; '744 pat., col. 38:46-50. Finally, Plaintiff points to language stating:

> FIG. 11 shows an example of a hardware architecture 1100 of one embodiment of the present invention. The present invention may be implemented using any hardware architecture, of which FIG. 11 is illustrative. A bus 1114 connects the various hardware subsystems. A display 1102 is used to present the operative interface 123 of FIG. 1. An I/O interface 1104 provides an interface to input devices, such as keyboard and mouse (not shown). A network interface 1105 provides connectivity to a network, such as an Ethernet network, a Local Area Network (LAN), a Wide Area Network (WAN), an IP network, the Internet, etc. (not shown in FIG. 11). Various sensory devices 1115 may be connected to the bus 1114. RAM 1106 provides working memory while executing process 1300 of FIG. 13. Program code for execution of process 1300 of FIG. 13 may be stored on a hard disk, a removable storage media, a network location, or other location (not shown). CPU 1109 executes program code in RAM 1106, and controls the other system components.

*Response* [#56] at 11 n.29; '744 pat., col. 39:63-40:14. Figure 11 has been provided above in Section III.E.2.b.ii.(b), Figure 1 above in Section III.E.2.b.ii.(a), Figure 13A above in this section, and Figure 13B above in Section III.E.2.b.ii.(b).

"In plain English," Plaintiff explains that a "sensory event analytics module" means that "(1) sensors like surveillance cameras record video data; (2) the data is processed; and (3) events, like a face, are detected and extracted." *Response* [#56] at 9. Plaintiff points to Figure 13A, provided above in this section, as "illustrat[ing] the flowchart of one

embodiment of the invention, computer process 1300, which includes information about how the sensory events module operates: it captures data from a camera (for example)," and then performs image processing techniques which Plaintiff's expert Dr. Shirvaikar asserts were well-known at the time of the invention in 2007. *Response* [#56] at 9; *Decl. of Shirvaikar* [#56-1] ¶ 14. This image processing can include detection of a variety of events, including "the presence of an intruder in a restricted area; a person or vehicle enters or leaves a designated area; an object left or taken in a restricted area; loitering person or vehicle; the speed of motion of an object; the size of an object; license plate of a vehicle; facial recognition etc." *Response* [#56] at 9; '744 pat., col. 42:53-43:18.

These "events are identified via data processing." *Response* [#56] at 10; *see also In re Katz*, 639 F.3d at 1316 (stating that general functions, including "processing," do not require structure). "The data processors can be located in sensors, for example, in a camera; alternatively, general-purpose hardware, like a processor, running software can detect events[.]" *Id.*; '744 pat., col. 8:13-17. Further, a video analytics device performing event-detection image processing "may consist of software running on a general purpose hardware device." '744 pat., col. 9:55-56. A video analytics server, as shown at 1207 in Figure 12, "provides video analytics device functionality in addition to an interface to search, retrieve, [and] analyze the video data by event stored on data server 1208." *Response* [#56] at 10 (citing '744 pat., col. 41:14-17); '744 pat., fig. 12 (1207, 1208).

In addition, "the hardware architecture for one embodiment of the invention that executes process 1300" from Figures 13A and 13B is found in Figure 11. *Response* [#56] at 11; '744 pat., col. 39:63-40:14. As noted by Plaintiff, "[p]rocess 1300, which incorporates a sensory events module, is executed by CPU 1109 in RAM 1106 to process

the sensory data to detect one or more sensory events[.]" *Response* [#56] at 12. The module "may be software on a sensor (such as a camera) or software on a general purpose hardware such as a processor, i.e., a video analytics device." *Id.*

The Court finds that the structure to which Plaintiff points is more robust than for the modules analyzed in the two prior sections, and that, for much of this module, i.e., the parts consisting of basic computer-implemented functions, no structure is required. *See In re Katz*, 639 F.3d at 1316. Thus, when this consideration is combined with the referenced figures and text, the Court finds that Plaintiff has shown that the specification contains *some* algorithmic structure.

Again, Defendant argues that this structure is insufficient. *Reply* [#62] at 3-4. However, that argument again is premature. This is another classic "some disclosed algorithm" situation under *EON Corporation*, and therefore "arguments regarding the sufficiency of the disclosed algorithms must be evaluated according to expert testimony" based on the perspective of a POSITA. *CellCast Techs., LLC*, 150 Fed. Cl. at 382. Thus, the evaluation of whether the claim is indefinite pursuant to § 112 ¶ 6 must be "left for summary judgment, allowing the parties the ability to conduct expert discovery proceedings and present all necessary arguments and evidence." *Id.* The Court finds that Defendant has not shown by clear and convincing evidence at this stage of the proceedings that "sensory event analytics module" is indefinite.

## IV.  Conclusion

For the foregoing reasons,

IT IS HEREBY **ORDERED** that the Motion [#63] is **GRANTED**, and the disputed claim terms will be construed to the extent indicated above.

Dated: September 27, 2024                    BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge